Alan H. BRADER, Appellant,

v.

**ALLEGHENY GENERAL HOSPITAL.***

No. 98–3223.

United States Court of Appeals, Third Circuit.

Argued Dec. 10, 1998.

Decided Feb. 12, 1999.

* Amended per Clerk's order dated 10/27/98

**834**

Marshall J. Tindall (argued), Mary Kate Coleman, Davies, McFarland and Carroll, P.C., Pittsburgh, PA, for appellant.

** Honorable Stanley S. Harris, United States District Judge for the District of Columbia, sitting by

Michael J. Lynch (argued), David L. McClenahan, Paul K. Stockman, Kirkpatrick & Lockhart, Pittsburgh, PA, for appellees.

Before: BECKER, Chief Judge, STAPLETON, Circuit Judge, and HARRIS, District Judge.**

## OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal by plaintiff Dr. Alan Brader ("Brader") from the grant of summary judgment in favor of defendant Allegheny General Hospital ("AGH" or "Hospital") on Brader's suit alleging breach of contract in connection with several hospital privileges and promotion decisions. The appeal requires us to determine whether AGH met the requirements for immunity under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.* ("HCQIA"), or, in the alternative, under the Hospital's internal Bylaws. The district court held that AGH was immune from suit under AGH's Bylaws.

The HCQIA, which was designed to encourage physicians to engage in reviews of their peers, permits immunity to attach to such review activities provided that the reviews meet certain procedural requirements. *See* 42 U.S.C. § 11112(a). A doctor challenging the review process must prove, by a preponderance of the evidence, that the review process was unreasonable. *See id.* We conclude that Brader has failed to produce sufficient evidence for a reasonable fact finder to conclude that AGH acted unreasonably. Immunity therefore attaches to AGH. Thus, we affirm without reaching the question whether AGH is entitled to immunity under the Bylaws.

### I. *Facts*

A. *Brader's Problems in the Operating Room and with Hospital Personnel*

Brader is a surgeon who joined AGH's provisional medical staff on July 1, 1988. Under AGH's Bylaws, which govern the

designation.

rights and responsibilities of both permanent and provisional medical staff members, a doctor initially serves as a provisional staff member and requests advancement after one year at that level. *See* Bylaws Art. III § 1.A. Dr. Diamond, the director of the Division of General Surgery, was Brader's direct supervisor. Dr. Magovern was Chairman of the Department of Surgery and Diamond's supervisor.

Soon after his arrival at AGH, Brader performed an abdominal aortic aneurysm ("AAA") repair on a patient. During the course of the operation, the patient allegedly sustained a number of visceral injuries and died on the operating table. Diamond, who observed the surgery at its tail end, concluded that the patient died not from the aneurysm but as a result of bleeding from the injuries. He also believed that Brader had delegated too much responsibility to a resident during the operation and that Brader had failed to resume control fast enough when the operation began to go badly.

On May 29, 1989, Brader operated on a patient who had sustained a stab wound to the chest. Brader argued with Dr. Demmy, the cardiothoracic surgical resident on call, over the proper surgical approach to the patient. Brader overruled the resident's approach—even though the attending cardiothoracic surgeon had approved Demmy's plan—and proceeded to operate using a median sternotomy. However, it became clear during the surgery that this approach was not adequate, and Brader's incision had to be extended significantly, resulting in a longer patient recovery. Magovern felt that Brader's approach was a serious departure from the way AGH handled stab wounds to the chest, and that the wound could have been handled much more judiciously using Demmy's plan. Brader's explanation (in his testimony) was that he was the physician responsible for the patient, and that he was "not about to relinquish the care of this critically ill patient at that point to a cardiothoracic surgery fellow" whom he had not met before.

This incident led to the first of several meetings between Diamond and Magovern about Brader's personal and professional behavior. Magovern indicated that he wished to fire Brader based on the incident with Demmy, but Diamond defended Brader's action. Diamond encouraged Magovern to talk to Brader. Magovern did so, but according to both parties, the meeting was "a disaster." Brader testified that Magovern was "out to get him from the minute one," whereas Magovern felt that Brader's tone was rude, offensive, and insubordinate. Magovern emerged with the impression that Brader would not accept AGH's triage protocol, under which patients with chest wounds were to be treated by the cardiothoracic service.

The record portrays Brader as a disruptive force in the hospital. Not only did he cause friction between the cardiothoracic unit and the trauma service, but he also told orthopedic trauma surgeons that they were not using the proper procedures for certain traumas. As a result, Diamond had to intercede to "calm the waters." Brader allegedly made derogatory statements to nurses, but at a meeting organized by Diamond to address the issue, Brader refused to act in a conciliatory manner. Diamond testified, "It really was incredibly unpleasant, time consuming, and literally every day there was a new nightmare of some kind" that he had to solve.

On October 27, 1989, Brader operated on another stab wound patient but did not notify the cardiothoracic service that the patient had a chest wound. Brader's decision again created controversy, since it violated hospital protocol. On January 7, 1990, during an elective AAA repair, Brader was unable to control the bleeding, and was forced to sacrifice the patient's left kidney. The patient's spleen was lacerated as well. The patient died a few hours later. By virtue of these events, AGH decided on February 27, 1990, to extend Brader's provisional Medical Staff membership for a year rather than promote him to "attending" status.[1]

---

1. The conflicts apparently did not diminish after this decision, even though Diamond advised Brader to "be a good citizen of the hospital" during his second provisional year. On April 20, 1990, claiming that someone had been tampering with his computer, Brader instructed his secretary to have the locks on his office door changed and to give no one else a copy of the new key. This created a dispute between his secretary and

## B. *The Internal Review*

In the spring of 1990, several AGH anaesthesiologists approached Magovern about the amount of time taken and quantity of blood used in AAA procedures. In response, Magovern asked the Quality Assurance Department ("QAD") to compile data for each AAA procedure performed. The QAD broke out its results for each physician. Magovern testified that "[w]hat was striking was that of the 5 people who had done the [AAA] cases, one surgeon accounted for 50 percent of the mortality in the ruptured abdominal cases, whereas the other 4 people ... [had approximately] 10 percent" each. That one surgeon was Brader. Magovern felt that it was "a difference enough within [Brader's] group that it should be looked into," and asked Diamond to do so.

Diamond reviewed and compared the AAA procedures performed by Brader and the other surgeons. He concluded that Brader's operative record reflected deficiencies in skill, as well as "unconscionable" judgment. Diamond was less concerned with Brader's mortality rate than with the injuries and complications that occurred during his surgeries, and the fact that he gave residents too much responsibility. On May 25, 1990, Diamond and AGH Vice President Virginia Opipare met with Brader about these findings. Brader did not have advance notice of the meeting. The trio agreed that the Hospital would seek an outside reviewer to look over Brader's AAA procedures, and that Brader would temporarily, and voluntarily, stop performing AAA repairs.

Three days later, Brader sent Opipare a note stating that the "impromptu nature of this meeting was most unfair to me." Brader also indicated that he had spent the weekend reviewing his AAA experience and results. According to his calculations, his mortality rate stood at 52.9%. His letter also stated that he had reviewed 165 AAA cases from AGH and calculated the overall mortality rate as 52.7%; that in 1988 AGH had two full time attending surgeons with mortality rates over 70%; and that "a prompt reversal of [their] decision to suspend [his] abdominal

aortic aneurysm privileges [was] necessary and clearly warranted."

## C. *Suspension of Brader's AAA Privileges*

After some difficulty finding an outside reviewer, AGH found a New Orleans surgeon named Dr. John Ochsner to review Brader's file. Brader agreed to Ochsner's selection. The Hospital sent Ochsner the AAA Quality Assurance study, individual case lists for general surgeons, case summaries prepared by Diamond, and pertinent patient records. Brader also submitted his own summary and interpretation of his AAA procedures. Brader requested that he be available to answer any questions the reviewer might have and that he be able to meet with the reviewer before any decision was made, although it is not clear whether Diamond and Opipare agreed to this request.

In a letter dated September 27, 1990, Ochsner submitted to AGH a summary of his findings. In it, he stated:

Of greatest concern ... was the fact that of the twelve ruptured abdominal aortic aneurysms there were a tremendous number of complications.... The mortality rates for such cases can be quite high. However, the thing that concerned us most was that there were many complications and many maneuvers in what we would consider poor surgical judgement.... In general, intra-abdominal visceral injuries are quite rare during aortic surgery but there were fifteen different intra-abdominal visceral injuries in the twenty patients.... In conclusion, at our institution if a staff surgeon had this sort of record on his vascular operations, we would insist that he be supervised by more experienced surgeons for a period of time until his technique and judgement could be ascertained to be adequate or not.

On October 12, Magovern and Opipare met with Brader to discuss the Ochsner report. Magovern requested that Brader continue to refrain from performing AAA repairs without supervision. Brader refused, stating that he would perform any such procedures that came in while he was on call. Brader

<hr>

her supervisor, who insisted that she be given a copy of the key.

stated that the only way for Magovern to prevent him from doing AAA repairs was to suspend his privileges. Magovern thereupon suspended Brader's AAA privileges and reported the suspension to Anthony Sanzo, President of AGH. In his letter to Sanzo, Magovern stated that he had "determined it would be necessary, in order to prevent 'an imminent danger to the health of any individual,' to suspend Dr. Brader's privileges to perform abdominal aortic aneurysm procedures." Sanzo wrote to Brader the same day, informing him that his AAA privileges had been suspended and advising him of his procedural rights under the Bylaws.

### D. Denial of Brader's Advancement to Attending Staff Status

While these events were unfolding, Diamond had decided that he could not support Brader's advancement to full membership on the medical staff. In an August 1, 1990 letter to Magovern, Diamond stated that he had defended Brader in the past, but had reached the conclusion that Brader "has not changed significantly and that he will continue to be disruptive and unable to satisfy Allegheny's standards of patient care and teaching." Magovern agreed, and said so in his letter to Dr. George Berg, Chairman of the Medical Staff's Credentials Committee ("CC"). The CC, which had before it Brader's request for advancement from his provisional staff status, considered Diamond's and Magovern's letters, letters from Brader to the CC, and letters of support for Brader from various doctors and hospital employees. On October 15, the CC voted 7–1 to recommend to the Executive Committee ("EC") that Brader not be advanced to attending staff membership. Berg testified that the CC made its decision in order to safeguard AGH's patients.

The CC's recommendation went to the EC. The EC considered the CC recommendation and asked Diamond and Magovern to elaborate on the bases for their recommendations, which they did. The EC concluded that (1) Brader was unable to work harmoniously with others at AGH; (2) Brader had exercised poor surgical judgment, which posed a threat to patients; and (3) he was unable to take directions and accept others' authority. The EC voted unanimously that Brader not be advanced; Diamond and Magovern refrained from voting. Sanzo wrote to Brader on the same day, informing him of the EC decision and of his due process rights.

### E. Suspension of All Clinical Privileges

In the same EC meeting, the Committee expressed concern that Brader was a "loose cannon" who would present a risk to patients and therefore discussed suspending all of Brader's clinical privileges. Although the EC took no formal action, it suggested that Magovern evaluate whether it was appropriate for Brader to continue to exercise any clinical privileges. The next day, Magovern recommended to Sanzo that Brader's privileges be summarily suspended, stating that a failure to suspend all his privileges "has substantial potential for exposing the hospital's patients to imminent danger." Sanzo accepted this recommendation and notified Brader by letter of Sanzo's decision and of his due process rights.

### F. Hearing on the Decision to Suspend Brader's AAA Privileges

Following these three decisions—to suspend Brader's AAA privileges, not to recommend his advancement to the attending staff, and to suspend all of his clinical privileges—Brader exercised his rights under the Bylaws and requested hearings with respect to each decision. According to the Bylaws, the purpose of a hearing is to recommend a course of action to AGH's Board of Directors, and should be conducted in as informal a manner as possible. Bylaws, Art. VIII § 1. The hearing panel is required to support the original finding unless the recommendation at issue in the hearing is "unreasonable, not sustained by the evidence, or otherwise unfounded." *Id.* § 3 .H.iii.

During the five-day hearing in 1991 regarding Magovern's suspension of Brader's AAA privileges, Brader called seven witnesses. AGH called five, each of whom was subject to cross-examination by Brader's counsel. The hearing panel had before it Ochsner's report, as well as testimony about the October 12, 1990 meeting of Brader, Ma-

govern, and Opipare, and written arguments by Brader. At the hearing's conclusion, the panel unanimously recommended: (1) that Magovern had the authority to suspend Brader's privileges; (2) that Magovern's actions had been proper; but (3) that Brader's suspension should be lifted because the panel concluded that his performance of AAA surgery did not constitute an immediate danger to the health of any patient. This recommendation, which Brader did not appeal, was forwarded to AGH's Board of Directors for further action.

### G. Hearing on the Total Privilege Suspension and the Decision Not to Advance Brader to Attending Status

The second hearing, held over ten days in 1992, reviewed the decision to totally suspend Brader's clinical privileges and the decision not to advance him to the attending staff. Brader called two witnesses (including himself) and AGH called six, each of whom was subject to cross-examination. The panel called two witnesses of its own, who also were subject to cross-examination. The panel heard testimony about Brader's AAA procedures, Ochsner's report, Brader's reaction to that report, and Brader's hostile interactions with others. At the end of the hearing, the panel upheld the summary suspension of Brader's privileges, but recommended that the suspension be lifted as moot, since by then Brader had relocated to North Carolina. In addition, the panel noted that because of difficulties accepting guidance and acting collegial, "the Executive Committee of the Medical Staff's recommendation to not advance Dr. Brader from Provisional Staff status was made in good faith and based on proper and reasonable evidence and should be sustained."

### H. Appellate Review

Brader appealed the 1992 panel's recommendation to an appellate review panel, as provided for in the Bylaws. The Bylaws state that the grounds for appeal shall be that there was a substantial failure to comply with the Bylaws, the recommendation was arbitrary or capricious, or the recommendation was not supported by the evidence. By-

laws, Art. VIII § 4.B. The panel reviewed written submissions from and heard oral argument by both sides. The appellate panel upheld the hearing panel's recommendation that Brader not be granted attending status, deciding that Brader was not denied due process, that he received a fair hearing, and that the recommendations of the CC, the EC, and the hearing panel were substantially supported by the evidence. However, the panel recommended that the summary suspension of all of Brader's clinical privileges be lifted because there was insufficient substantive medical evidence to warrant continued suspension. These recommendations were sent to the Board.

### I. The Board of Directors' Decision

The Board considered the 1991 hearing panel's recommendations, the 1992 panel's recommendations, and the January report from the appellate review panel. The Board sustained the summary suspension of Brader's AAA privileges, amended the suspension to state that Brader could perform AAAs under the supervision of more experienced surgeons, denied Brader's application for advancement to attending staff, and sustained the total suspension of his privileges, although it accepted the appellate panel's recommendation that the suspension be lifted.

### II. Procedural History

Dissatisfied with the results of the administrative hearings, Brader filed suit in federal district court in November 1993, alleging antitrust and breach of contract claims against AGH, Magovern, and Diamond. The district court had jurisdiction under, inter alia, 28 U.S.C. § 1332, since Brader then resided in North Carolina. He later amended his complaint, adding claims against the two professional corporations with which Magovern and Diamond were affiliated.

■ Defendants moved to dismiss Brader's complaint for failure to state a claim, and the district court granted their motion. On appeal, we reversed and remanded, holding that Brader's complaint satisfied the liberal standards of federal notice pleading. See Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 879 (3d Cir.1995). Subsequent discovery es-

tablished that Brader's antitrust claims were insupportable, and he dismissed them. He also stipulated to the dismissal of Magovern and Diamond and their two professional corporations as defendants. The sole remaining claim was the breach of contract action against AGH, in which Brader alleged that the Hospital breached its contract with him by violating the Bylaws. The district court issued an order granting AGH summary judgment on the contract issue. Brader timely appealed. We have jurisdiction under 28 U.S.C. § 1291 to review the district court's final order. Our review of the district court's grant of summary judgment is plenary. *See Schoonejongen v. Curtiss–Wright Corp.*, 143 F.3d 120, 126 (3d Cir .1998).

### III. *The Health Care Quality Improvement Act*

The primary question before us is whether AGH's conduct warrants immunity, as provided for in the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101–11152. In passing the Act, Congress intended "to improve the quality of medical care by encouraging physicians to identify and discipline physicians who are incompetent or who engage in unprofessional behavior." H.R.Rep. No. 903, 99th Cong., 2d Sess. 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6384. Thus, the Act contains a provision granting limited immunity from suits for money damages to participants in peer review actions, thereby encouraging doctors who would otherwise fear the threat of litigation to participate in effective professional peer review procedures. *See* 42 U.S.C. §§ 11101(4)–(5); 11111(a).[2]

A professional review action must meet certain standards in order for review action participants to receive immunity. *See Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 632 (3d Cir.1996). 42 U.S.C. § 11112(a) provides:

(a) In general

For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

*Id.*

The Act includes a presumption that a professional review action meets each of the four prongs of Section 11112(a) unless the plaintiff can rebut the presumption by a preponderance of the evidence. *See* 42 U.S.C. § 11112(a) ("A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence."); *Mathews*, 87 F.3d at 633. The standard for reviewing summary judgment under the HCQIA is therefore unconventional: although the defendant is the moving party, we must examine the record to determine whether the plaintiff "satisfied his burden of producing evidence that would allow a reasonable jury to conclude that the Hospital's peer review disciplinary process failed to meet the standards of HCQIA." *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1334 (11th Cir.1994). With the purpose of the HCQIA and the burden allocation in mind, we turn to Brader's specific arguments why immunity should not attach to the various peer review actions taken against him by AGH.[3]

**2.** Under the HCQIA, those who may receive immunity include: the professional review body, any person acting as a member or staff to the body, any person under contract or other formal agreement with the body, and any person who

participates with or assists the body with respect to the action. *See* 42 U.S.C. § 11111(a).

**3.** Brader does not contest that the actions at issue here were "professional review actions" to

**840**

## IV. *Immunity Under the HCQIA*

### A. *Reasonable Belief that the Action Furthered Quality Health Care*

█ Brader contends that he has raised material issues of fact as to whether AGH was motivated by something other than a reasonable belief that its actions would further the care of its patients. Like other circuits, we have adopted an objective standard of reasonableness in this context. *See Mathews,* 87 F.3d at 635; *see also Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1030 (4th Cir.1994); *Bryan,* 33 F.3d at 1335; *Smith v. Ricks,* 31 F.3d 1478, 1485 (9th Cir. 1994). Therefore, the good or bad faith of the reviewers is irrelevant. "The real issue is the sufficiency of the basis for the [Hospital's] actions." *Bryan,* 33 F.3d at 1335. The "reasonable belief" standard articulated in § 11112(a)(1) will be satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients." *Mathews,* 87 F.3d at 635, quoting H.R.Rep. No. 903, 99th Cong., 2d Sess. 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 6393.

Brader alleges that Ochsner's report was inaccurate and inadequate to such a degree that it was not reasonable for the Hospital to rely on it as the basis for placing restrictions on Brader's privileges. Specifically, Brader faults Ochsner's external review because—he claims—it was based in large part on Diamond's study. First, Brader claims that the Ochsner report relies on faulty comparative data, since the Diamond report included only selected cases of other surgeons rather than each surgeon's complete AAA caseload. For example, Diamond's report apparently included five of Dr. Raves's ruptured aneurysms but did not report another three, two of which resulted in dead patients. Brader admits that those three operations occurred outside the time period selected by Diamond, but he claims that the selection of that time period is, in itself, telling. Brader also alleges that one of Dr. Young's patients was omitted, but acknowledges that the omitted patient had survived. Finally, Brader states that Diamond omitted one of Dr. Townsend's patients, and that patient died.

Second, Brader asserts that the Ochsner report attributes patient complications to Brader that were caused by other physicians. However, Brader offers only one piece of evidence to support this assertion: Diamond's report states that one of Brader's patients was transported with a cross-clamp on, but Brader alleges that that case was Townsend's. Third, Brader believes that Ochsner failed to address the physiological and risk status of each patient operated on. He claims that many of his patients were hypotensive prior to surgery, and thus that he should be expected to have a higher patient mortality rate. But Ochsner's report acknowledged this fact; in addition, Brader does not offer evidence that the patients of other doctors included in the study were not hypotensive.

█ We are unwilling to conclude that a failure to include absolutely every AAA patient in a quality assurance review, or one mistaken attribution in a host of records, undermines an otherwise thorough report. In addition, the ultimate decisions made by Magovern and the various hearing panels were not based exclusively on Diamond's or Ochsner's report, nor were the decisions based exclusively on an evaluation of Brader's surgical skills. Instead, these entities had before them ample evidence that Brader was a disruptive force at AGH and that he exercised poor judgment repeatedly in his

which immunity under § 11112 might apply. Section 11151 defines "professional review actions" as follows: "The term 'professional review action' means an action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges ... of the physician. Such term includes ... professional review activities relating to a professional review action." 42 U.S.C. § 11151(9). We think it quite clear that each of the recommendations leading up to formal action and the formal actions themselves were professional review actions, so we will proceed to consider the immunity requirements.

surgical, teaching, and personal interactions. Brader has failed to produce sufficient evidence that AGH's various review panels could not reasonably have concluded that suspending Brader's privileges would be in the best interests of AGH's patients. *See Imperial*, 37 F.3d at 1030 ("[E]ven if [the plaintiff] could show that these doctors reached an incorrect conclusion ..., that does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality.").

Brader also argues that he has overcome the presumption that the professional review action met the standard for immunity with regard to AGH's decision not to advance him to the attending medical staff. However, the only evidence Brader offers is a bald statement that AGH made its decision based on the "flawed" Ochsner report. Brader claims that the other evidence before the EC was "unsupported hearsay evidence." However, the Bylaws clearly state that hearing panels under the Bylaws shall admit any relevant evidence, regardless of its admissibility in a court of law. *See* Bylaws, Art. VIII § 3.E. In addition, the evidence before the EC included the recommendation of the CC, which had considered all relevant evidence, and elaborations by Diamond and Magovern, who were integral parties to the dispute.

In sum, we find no merit in Brader's argument that he produced evidence sufficient to call into question whether the reviewers acted under the reasonable belief that they were protecting patients. Each set of reviewers, with the information available to them, reasonably would have concluded that their actions in recommending suspension of or in suspending Brader's privileges and recommending or deciding not to promote Brader to attending staff would both restrict incompetent behavior and protect AGH's patients. *See Mathews*, 87 F.3d at 635.

### B. *Reasonable Effort to Obtain the Facts*

Brader also argues that he has introduced evidence sufficient to show that AGH failed to make a reasonable effort to ascertain the true facts of the situation. In support of this argument, Brader once again raises the specter of Diamond's study, claiming that any flaws in this study irreparably tainted the hearings and appellate procedures. He also alleges that his views were not heard before adverse action was taken against him. Brader invokes in this regard the testimony of Dr. Betancourt, a panel member at the 1991 hearing. Betancourt testified about alleged errors in Diamond's report, but based most of his testimony on what Brader had told him.

The relevant inquiry under § 11112(a)(2) is "whether the totality of the process leading up to the Board's professional review action ... evidenced a reasonable effort to obtain the facts of the matter." *Mathews*, 87 F.3d at 637. Even assuming a flaw in the Diamond report, we reiterate that Diamond's and Ochsner's reports were not the only sources of information used in reaching decisions about Brader's professional status. AGH's Quality Assurance Department had compiled the initial study of AAA procedures. Magovern had the advantage of the QAD study, as well as his and Diamond's first-hand observations about Brader's behavior, demeanor, and surgical performance, when he decided to suspend Brader's AAA privileges. The hearing panels themselves heard testimony from a number of witnesses, including individuals the panels called independently. The appellate review panel and the Board of Directors had before them exhibits, briefs, and reports, including those submitted by Brader. Given those facts, we cannot conclude that Brader's concern about Diamond's report, even if valid, is sufficient to rebut the presumption that AGH made a reasonable effort to ascertain the facts of the matter before each professional review action was taken.

### C. *Adequate Notice and Hearing Procedures*

The third requirement of § 11112(a) is that AGH afford Brader adequate notice and hearing procedures, or "other procedures as are fair to the physician under the circumstances." § 11112(a)(3). Section 11112(b) creates a safe harbor whereby professional review actions meeting the provisions of that section will be deemed to have met the notice and hearing requirement of § 11112(a)(3).

Brader argues that AGH failed to meet § 11112(a)(3) in two ways. First, he claims that he did not receive the required process when the 1992 hearing panel simultaneously considered his advancement to attending staff and the suspension of his clinical privileges. This consolidation of issues, he argues, prevented him from receiving an unbiased hearing on either issue. His second complaint is that AGH failed to provide him with the requisite procedures before it performed the informal quality assurance study.

The district court concluded that Brader's contentions gave rise to questions of fact and that summary judgment based on immunity under the HCQIA was unwarranted. We disagree, concluding that neither of Brader's allegations, taken in a light most favorable to him, rebuts the fact that he received ample notice and hearing procedures at all relevant points in the chronology.

▪ First, we find no support for the contention that a combined hearing on Brader's promotion and on his privileges was impermissible or unfair under the HCQIA. Nothing in our jurisprudence requires that related matters involving essentially identical sets of evidence be severed from each other. *See* Fed.R .Civ.P. 42(a) (permitting consolidated hearings on related matters).

▪ Second, Brader alleges that Magovern, in instigating the quality assurance study, failed to provide him with the process due him, thereby tainting the rest of the review process. The QAD study, an informal investigation that led up to professional review activity, does not disqualify the entire review process from the protections of the HCQIA. As one court has noted, "The HCQIA does not require that a professional review body's entire course of investigative conduct meet particular standards in order for it to be immune from liability for its ultimate decision." *Fobbs v. Holy Cross Health System Corp.*, 789 F.Supp. 1054, 1065 (E.D.Cal.1992), *aff'd in relevant part*, 29 F.3d 1439 (9th Cir.1994). For us to conclude otherwise would be to tie the hands of hospitals and force every informal review activity of a

doctor or a department into time-consuming and (depending on the outcome of the informal review) possibly unnecessary formalized proceedings.

▪ We believe that AGH has met the safe harbor requirements set out in § 11112(b), and that it therefore has met the third prong of the immunity provision of § 11112(a). AGH gave Brader notice of each professional review action to be taken, informing him of his due process rights and the time in which he had to request a hearing. *See* § 11112(b)(1). The same day that the EC decided to recommend that Brader not be advanced to full staff and that all of his privileges be suspended, Sanzo, the Hospital president, wrote to Brader, informing him of his right to seek hearings on these recommendations.

The one instance in which AGH did not give Brader advance warning before an adverse action was taken was when Magovern summarily suspended his AAA privileges.[4] However, Magovern's action is covered by § 11112(c), which provides that the procedures of § 11112(a)(3) do not preclude "an immediate suspension or restriction of clinical privileges, subject to subsequent notice and hearing or other adequate procedures, where the failure to take such an action may result in an imminent danger to the health of any individual." *See* § 11112(c). Sanzo wrote to Brader the same day that Magovern suspended Brader, confirming that he had been suspended and informing him of his procedural rights.

After Brader requested his hearings, he was given notice of the time, place, and date of the hearings, and was given a list of witnesses expected to testify on AGH's behalf. *See* § 11112(b)(2). The hearings themselves conformed to § 11112(b)(3)'s requirements: the hearings were held before a panel appointed by AGH; Brader was represented by an attorney; and he was allowed to cross-examine witnesses, present evidence, and submit a written statement at the end of the hearings. Brader also re-

---

4. Although Brader did not receive formal notice before his AAA privileges were suspended, he clearly was on informal notice that he might be suspended. In fact, he told Magovern that the only way to prevent him from performing AAA procedures was to suspend him.

ceived the panels' written recommendations, which included the bases for the decisions. *See* § 11112(b)(3)(A)–(D). We conclude that the District Court erred in deciding that there were genuine issues of fact as to whether § 11112(a)(3)'s requirements were met.

### D. *Belief That the Actions Were Warranted*

The final inquiry under § 11112(a) is whether the professional review action was taken in the reasonable belief that the action was warranted by the facts known after a reasonable effort to obtain those facts. Our analysis under § 11112(a)(4) closely tracks our analysis under § 11112(a)(1). In light of what Magovern knew of Brader's AAA performance in the Hospital, based on the QAD report and personal experience, a decision to relieve Brader of his AAA privileges was both narrowly tailored and reasonable, especially since Brader rejected Magovern's suggestion that Brader be supervised in performing AAA procedures. Likewise, the factual bases for the decisions of the CC, EC, hearing panels, and appellate review panel have been set forth in detail above. Participants in those reviews repeatedly emphasized that the focus of their decision was always on the safety of patients.

Although not every panel reached identical conclusions about the necessity of suspending Brader's privileges, a plaintiff's showing "that [the] doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding" does not "meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process." *Imperial,* 37 F.3d at 1030. Furthermore, the reports of Diamond and Ochsner were not so obviously mistaken or inadequate as to make reliance on them unreasonable. *See Mathews,* 87 F.3d at 638. Brader has produced insufficient evidence to rebut the presumption that each professional review action was taken in the reasonable belief that it was warranted in light of the facts known and reasonably ascertained.

### V. *Conclusion*

In this case, a physician who had been disciplined by his hospital sought to have a court revisit that adverse medical and administrative judgment. This is precisely the type of case that Congress intended to foreclose in passing the HCQIA. "[t]he intent of [the HCQIA] was not to disturb, but to reinforce, the preexisting reluctance of courts to substitute their judgment on the merits for that of health care professionals and of the governing bodies of hospitals in an area within their expertise." *Bryan,* 33 F.3d at 1337.

We conclude that Brader has failed to rebut the presumption that AGH met the requirements for immunity under the HCQIA. He has failed to come forth with sufficient evidence to allow a reasonable jury to conclude that the Hospital did not provide him with adequate and appropriate procedures, or that AGH did not act at all times in the reasonable belief that its actions would further quality health care. The grant of summary judgment to AGH will therefore be affirmed.