

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-21-1999

# Pamintuan v. Nanticoke Mem. Hosp.

Precedential or Non-Precedential:

Docket 98-5502

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Pamintuan v. Nanticoke Mem. Hosp." (1999). *1999 Decisions*. Paper 258.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/258

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 21, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-5502

ELVIRA PAMINTUAN, M. D.,
        Appellant

v.

NANTICOKE MEMORIAL HOSPITAL

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

(D.C. No. 96-cv-00233)
District Judge: The Honorable Sue L. Robinson

ARGUED June 17, 1999

BEFORE: NYGAARD, STAPLETON, and COWEN,
Circuit Judges.

(Filed September 21, 1999)

        Leonard L. Williams, Esq. (Argued)
        1214 King Street
        Wilmington, DE 19801

        Brian J. Bartley, Esq.
        Sullivan & Bartley
        1010 Concord Avenue
        Suite 200
        Wilmington, DE 19802

         Attorneys for Appellant

          Richard G. Elliott, Jr., Esq. (Argued)
          Claudia A. DelGross, Esq.
          Richards, Layton & Finger
          One Rodney Square
          P.O. Box 551
          Wilmington, DE 19899

           Attorneys for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge.

Appellant, Dr. Elvira Pamintuan, an OB/GYN who had her privileges suspended at Nanticoke Memorial Hospital, sued the hospital claiming that its action was racially motivated. Nanticoke Memorial defended its actions, citing concerns about the quality of care Dr. Pamintuan had been providing. On summary judgment, the District Court ruled that Dr. Pamintuan did not have standing to sue Nanticoke Memorial under Title VII because she was not an employee of the hospital. In addition, the District Court held that Dr. Pamintuan had failed to present sufficient evidence to support her claims of disparate treatment under 42 U.S.C. S 1981. Finally, the District Court found that the Health Care Quality Improvement Act, 42 U.S.C. S 11101 et seq., precluded a state law damage award. We will affirm.

I.

The facts, stated in the light most favorable to Dr. Pamintuan, are taken in large part from the District Court's opinion. See Pamintuan v. Nanticoke Mem'l Hosp. , C.A. 96-233, 1998 WL 743680 (D. Del. Oct. 15, 1998). Dr. Pamintuan, who is of Filipino descent, has been licensed to practice medicine in Delaware since 1971, specializing in obstetrics and gynecology. Until her suspension, she had staff privileges at Nanticoke Memorial. These privileges had been renewed periodically, most recently in 1992 for a two-year period, and included admitting, treating, and consulting patients at Nanticoke Memorial.

2

A. Obstetrics and Gynecology Departmental
Meetings

Beginning in December 1990, the minutes of the
 840<!>Department of Obstetrics and Gynecology1  monthly

meetings began to reflect concern with Dr. Pamintuan's
performance. Most of these notations indicate that she had
failed to comply with hospital policy concerning response
time and progress notes. For example, the minutes from the
December 1990 meeting reveal that the nursing supervisor
filed a report documenting Dr. Pamintuan's failure, in
violation of hospital bylaws, to timely respond to a call
regarding a cesarean section.2 Minutes from the December
1991 and January 1992 meetings record Dr. Pamintuan's
failure to promptly enter a patient's progress notes; as a
result the OB/GYN Department sent Dr. Pamintuan a
memo regarding the need for timely charting.

Similar concerns regarding delinquent charting were
raised at the September 1992 meeting:

> This was a patient from the clinic admitted on 7/21/92
> with acute pyelonephritis during pregnancy and stayed
> in the hospital for five days. Problem: no H & P, no
> progress notes and all orders were verbal except for
> admission and discharge. This chart was incomplete
> for two months. Only two entries were made. This
> chart was needed for a second admission and no
> documentation was present to assist with the second
> admission.

App. at B-305. As before, Dr. Pamintuan was sent a memo
about the incident. At the next meeting, the OB/GYN
Department voted to send the chart to Nanticoke
Memorial's Quality Assurance Committee for further
investigation because "the Department of OB feels that
patient care was compromised in this case because of the

_____

1. From 1990 through 1993, the OB/GYN Department consisted of five
physicians: Drs. Cabrera (Hispanic), Rupp (Caucasian), DeJesus-Jiloca
(Filipino), Tierno (Caucasian), and Pamintuan (Filipino).

2. The minutes indicate that further action on this matter was precluded
because "the OB nurses did not follow the Hospital Communication
Policy of beeping first or calling another physician."

lack of information in the chart, which is a violation of the medical staff practice in this institution."3 App. at B-307.

Concerns about Dr. Pamintuan's timeliness, chart deficiencies, and other complaints concerning her conduct continued to be documented at OB/GYN Department meetings throughout 1993. In January 1993, the Director of Maternal/Fetal Nursing complained about Dr. Pamintuan's response time (three hours) after being beeped; Dr. Pamintuan contended that her beeper was defective. In April 1993, the minutes reflect two complaints regarding Dr. Pamintuan. The first, from the Vice President of Nursing and Administration, accuses Dr. Pamintuan of improperly arranging to admit a patient while she was on the "sanctions list" for failure to keep her charts up-to-date. The second, from the Director of OR Nursing, accused Dr. Pamintuan of unnecessarily keeping the on-call team in the operating room from 1:45 am to 5:15 am. Dr. Pamintuan denied both incidents. These incidents were discussed at the May, June, July, and August 1993 meetings. Written statements were requested of all parties, including Dr. Pamintuan. In addition, the July 1993 meeting minutes reflect an additional complaint, from the chairperson of the OB/GYN Department, regarding Dr. Pamintuan's failure to answer her beeper, which required that he cover the delivery. Again, written statements of all those involved were requested. All of these incidents were forwarded to the Quality Assurance Committee for review. In addition, Dr. Rupp, the OB/GYN Department Chairperson, sent a letter to the Quality Assurance Committee reviewing the discussion concerning Dr. Pamintuan at the August OB/GYN Department meeting.

In March 1994, at the request of the Quality Assurance Committee, the OB/GYN Department held a special meeting to discuss Dr. Pamintuan's handling of two cases.

_____

3. With respect to this incident, Dr. Pamintuan admits that she left for vacation without completing the chart and, thus, the chart was incomplete at the time of the second admission. Dr. Pamintuan avers, however, that upon her return the chart remained incomplete because Dr. Rupp, OB/GYN Department Chairperson, had thefile sequestered in his office.

4

The standard of care in the first case was deemed appropriate. The second case involved a threatened miscarriage. Since only two physicians other than those involved in the case were present at the meeting, discussion was tabled until the April meeting.

At the April meeting,

> [i]t was unanimous department consensus that[Dr. Pamintuan] should have performed a timely dilation and evacuation for the patient in question. Her failure to recognize and treat the apparent spontaneous miscarriage was not consistent with appropriate gynecological care. Action: A memo will be sent to the Quality Assurance Committee of the Board with this finding.

App. at B-377. The report concluded:

> Administration has concern with the potential demonstration of inappropriate judgment [by] the above physician. Over the last 18 months there have been continued questions about her judgment and administration is concerned with safety of patients under this physician's care.

App. at B-377.

Besides Dr. Pamintuan's cases, other physicians' cases having complications were presented for review at the OB/GYN Department meetings. Like Dr. Pamintuan's, these cases were selected for review by the nurses. According to Dr. Pamintuan, during the time period January 1, 1992 through September 1994, there were "at least" twenty-four cases with complications involving OB/GYN physicians other than herself presented for "Morbidity Quality Assurance Review." Of these twenty-four cases, Dr. Pamintuan contended that "fifteen . . . involved morbidities that were more severe and reflected a lesser quality of care than were reflected in the two cases for which[she] was subjected to Professional Review Action by the Hospital Administration and its subordinate boards and committees." According to Dr. Pamintuan, "nearly all of the morbidities resulted after care provided by the three . . . Caucasian physicians in the OB/GYN Department." The

5

minutes of the OB/GYN Department meetings, however, do not indicate that either the OB/GYN Department or Dr. Pamintuan (who was the reviewing physician in seven of the twenty-four cases) found quality of care issues in these cases. The minutes state, for the most part, that the level of care administered was "appropriate," there was "no problem," or the "standard of care was met." According to the minutes, Dr. Pamintuan was the only OB/GYN physician whose conduct warranted review by the Quality Assurance Committee.[4]

B. The Review Process

    1. Quality Assurance Committee

In August 1993, upon the request of the OB/GYN Department, the Quality Assurance Committee[5] reviewed Dr. Pamintuan's cases for the previous three years. The Quality Assurance Committee identified several areas of concern regarding Dr. Pamintuan's patient care. Subsequently, the Committee met with Dr. Pamintuan to discuss its findings and proposed recommendations. Although Dr. Pamintuan initially agreed with aspects of the Quality Assurance Committee's proposed recommendations, she ultimately rejected them, claiming that confidentiality had been breached. As a result, the matter was referred to the Executive Committee for review and action.

    2. The Executive Committee[6]

_____

4. The minutes indicate that Dr. Pamintuan was not the only physician cited for lack of availability. The April and May 1992 minutes record an incident involving a physician who failed to respond to a delivery because he was in surgery. In response, the OB/GYN Department determined that " `it is the responsibility of the Obstetrician to be present for delivery or arrange for another Obstetrician to be present.' "

5. The Quality Assurance Committee is responsible for, inter alia, "the duty to assure the safety of patients and that patient care and hospital services, including the medical care provided by physicians at the Hospital, are the most appropriate for the health of the patient and of highest quality possible."

6. The Executive Committee is comprised of the officers of the medical staff, the chairpersons of each department, the ICU director, and the Emergency Department director.

In May 1994, the Executive Committee, finding the Quality Assurance Committee's recommendations unworkable, voted unanimously to suspend Dr. Pamintuan's clinical privileges pending further investigation. Dr. Pamintuan was notified by letter of the Executive Committee's decision. In response to a "Request for Investigation Concerning Possible Professional Review Action" submitted by the Quality Assurance Committee, the Executive Committee met with Dr. Pamintuan to discuss her suspension and the need for a formal investigation. At the meeting, the Executive Committee opted to reject Dr. Pamintuan's proposal for an informal intervention and voted unanimously to continue her suspension.

Rather than request a hearing, Dr. Pamintuan and Nanticoke Memorial agreed that she would take a six-month leave of absence beginning July 1, 1994, during which her suspension would be terminated and the formal investigation held in abeyance.

### 3. Investigating Committee

On September 26, 1994, Dr. Pamintuan's attorney requested that the Executive Committee proceed with a formal investigation. An Investigating Committee was formed to review Dr. Pamintuan's patient care. The members of the Investigating Committee were selected to ensure broad representation with respect to gender, ethnicity, and medical practice, where possible requesting female and Filipino physician participation.

The Investigating Committee was charged with reviewing six of Dr. Pamintuan's cases, with each member assigned to one case (one physician was assigned to two cases). Of the six cases reviewed, the Investigating Committee found "quality issues" in four and was unable to reach a conclusion regarding a fifth because of insufficient documentation of the complications that had occurred. On November 30, 1994, the Investigating Committee reported its findings to the Executive Committee.

Following a review of the findings of the Investigating Committee and the Quality Assurance Committee, the Executive Committee recommended that Dr. Pamintuan's

7

privileges be restored, conditioned on her completion of either an OB/GYN residency retraining program or a review course and recertification. Dr. Pamintuan was notified of the Executive Committee's decision by letter, which also documented the Committee's findings with respect to the deficiencies in Dr. Pamintuan's performance.

### 4. Judicial Review Committee

In January 1995, Dr. Pamintuan invoked her rights and requested a hearing. A Judicial Review Committee 7 and hearing officer were appointed. Hearings took place over several days in April and May 1995, during which Dr. Pamintuan was present and represented by counsel.

The Judicial Review Committee approved the Executive Committee's recommendation that Dr. Pamintuan undertake one of two retraining options as a condition of reinstatement. The Judicial Review Committee based its decision on a detailed and extensive review of the record, which led it to conclude that Dr. Pamintuan had"exhibited a pattern of inadequate record-keeping; unacceptable delays in providing necessary treatments; exposing patients to unacceptable risks; poor medical judgment[;] and[ ] disregard of hospital policies." App. at B-48.

### 5. Appeal Board

Dr. Pamintuan appealed the Judicial Review Committee decision before the Appeal Board of Nanticoke Memorial. Following briefing and oral argument, the Appeal Board affirmed the decision of the Judicial Review Committee. In January 1996, Nanticoke Memorial's governing body adopted the opinion of the Appeal Board. In addition, an

_____

7. Like the Investigating Committee, the six members of the Judicial Review Committee were selected by the president of the medical staff and an attempt was made to include medical staff who had not previously evaluated Dr. Pamintuan and who were not in direct economic competition with her. Because of this latter provision, however, none of the physicians who evaluated her performance specialized in obstetrics and gynecology.

8

adverse action report was filed with the Delaware Medical Practice Board.[8]

C. Dr. Pamintuan's Contentions and Evidentiary
        Support

        1. Disparate Treatment

Dr. Pamintuan contends that Nanticoke Memorial used the alleged deficiencies in her performance as a pretext for its actual discriminatory motive. She alleges that the actions taken against her were more severe than the sanctions imposed on non-Filipino physicians with similar records.

Regarding charting, Dr. Pamintuan contends that record-keeping problems at Nanticoke Memorial were long-standing and involved many physicians, not just Dr. Pamintuan. As early as March 1990, Executive Committee meeting notes indicate that physicians were delinquent in their record keeping, with two (neither of them Dr. Pamintuan) on the delinquent chart list for several months.

According to the minutes, these latter physicians' charting delinquencies were severe enough to jeopardize their reappointment. According to Dr. Pamintuan, during the last two weeks of her summary suspension, thirty percent of the hospital's medical staff was delinquent in completing charts. Dr. Pamintuan contends that since her termination the Nanticoke Memorial has indicated a "willingness to positively respond to other physicians" concerning delinquent charting. Specifically, Dr. Pamintuan points to two letters indicating that the charting delinquency problem has continued to be a hospital-wide concern since her suspension.

Like the charting problem, Dr. Pamintuan contends that response time has been a long-standing concern at Nanticoke Memorial. She points to the February 12, 1990 minutes of the OB/GYN Department meeting, which record that "[t]he OB nursing staff has concerns in regard to

_____

8. For a more detailed discussion of the review action, see Pamintuan v. Nanticoke Mem'l Hosp., Inc., C.A. No. 96-233, 1997 WL 129338 (D. Del. Feb. 24, 1997).

9

having difficulty reaching some OB physicians by beeper and/or phone." In response, the OB/GYN Department adopted a policy whereby detailed records were to be kept regarding each physician's response time and availability, such that the Department would be able to review cases and correct any problems.

Dr. Pamintuan argues with respect to clinical evaluations that Nanticoke Memorial failed to perform a valid comparative review of her performance with that of her colleagues. According to Dr. Pamintuan, the only way Nanticoke Memorial can establish that she was "in fact" subject to the same standard of quality review as other physicians would be by a comparative review analysis. In support of her argument, Dr. Pamintuan proffers the testimony of two physicians, Dr. Andrew Stiber[9] and Dr. Thomas Dyer,[10] both of whom testified at the Judicial Review Committee hearings. According to Dr. Dyer,

> in fairness I think that you have to review twenty-five consecutive cases of any practitioner, and also compare him to other people doing the same work. . .. If the quality assurance is questioned, the statistical consort that you could make a valid judgment on is twenty-five consecutive cases. And then of course the standard of care is what you're comparing it to, so you want to find out what another practitioner or other practitioners do with the same kind of case. I think that anecdotes are a problem.

App. at B-423 to B-424. Dr. Stiber, who provided a written review of Dr. Pamintuan's performance in the four cases before the Judicial Review Committee, found Dr. Pamintuan's care in all instances to have been appropriate. He concluded by stating:

> Finally, after reviewing all four cases, I am very

_____

9. Dr. Stiber is a clinical Associate Professor at New York University Medical Center and former Chairperson, Section 1, District II, of the American College of Obstetrics and Gynecology.

10. At the time of Dr. Pamintuan's review action, Dr. Dyer had been a practicing OG/GYN for nearly 30 years and Chairperson of the OB/GYN Committee at Milford Memorial Hospital for more than 25 years.

concerned that the issues here are not quality
assurance, but the issues of denying a doctor the right
to practice medicine.

App. at B-433.

To further substantiate her claim of disparate treatment,
Dr. Pamintuan points to the following excerpt from the
Executive Committee's January 19, 1994, meeting minutes:

QUALITY ASSURANCE: A representative from the
Quality Assurance Committee reported a problem with
a provider that caused a focus review on the provider's
care. Some timely action must be taken to move
forward and protect patients. A memo is being drafted
to outline steps to prevent professional review action
and allow this person to practice in an unencumbered
fashion. This type of intervention has worked in the
past. By the next Executive Committee meeting,
hopefully a volunteer program will be developed. The
concerns are: (1) 30% complication rate, (2) 30-40%
mortality rate post-op, and (3) 20-25% curative
infection rate. The trend will be sent to the Department
of Surgery. A process group with all involved will be
scheduled with a consensus standard developed. The
suggestion of a "Pre-Op Conference" could be helpful.

App. at B-436. Dr. Pamintuan alleges that the
aforementioned physician is Caucasian. Nanticoke
Memorial, however, contends that all but the last three
sentences of the excerpt refer to Dr. Pamintuan, with the
last three referring to a study on thoracotomy. [11]

_____

11. To further buttress her allegations of intentional discrimination, Dr.
Pamintuan points to instances in the past involving alleged
discrimination on the part of Nanticoke Memorial towards its employees
and its patients. Her evidence ranges from the testimony of a hospital
employee concerning segregation of patients in the 1950s and 1960s to
an alleged study, a copy of which was not produced, prepared in 1979
reporting "community concern that there were too many foreign
physicians in the Emergency Room." Dr. Pamintuan contends that in
response to the aforementioned survey, Nanticoke Memorial
discriminatorily removed all of the Filipino physicians from its emergency
room. Dr. Pamintuan also proffers the testimony of several former

11

## D. Nanticoke Memorial's Rebuttal Evidence

To rebut Dr. Pamintuan's allegations that she was singled out for discipline because of her race, Nanticoke Memorial offered evidence that between 1990 and 1996, six physicians other than Dr. Pamintuan were the subject of quality review that resulted in some form of action (voluntary or otherwise). One of the disciplined physicians was Filipino; the other five were Caucasian. Dr. Pamintuan contends that none of these physicians or situations is comparable to the case at bar.

Nanticoke Memorial also proffers its history of Filipino leadership in the medical staff. Between 1972 and 1994, the period when Dr. Pamintuan had privileges at the hospital, six Filipinos and five Caucasians served as president of the medical staff. Persons elected to be president serve a two-year term as president-elect and a two-year term as president. The president-elect and president also serve on the board of directors of Nanticoke Memorial.

## II.

Section 1981 prohibits "racial" discrimination in the making of private and public contracts. See St. Francis College v. Al-Khazraji, 481 U.S. 604, 609 (1987). We analyze section 1981 claims under the familiar McDonnell Douglas shifting burden framework used in Title VII discrimination cases. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Stewart v. Rutgers, The State Univ., 120 F.3d 426, 432 (3d Cir. 1997). Under this standard, Dr. Pamintuan had the burden of presenting a prima facie case of discrimination. To establish such a case under section 1981, Dr. Pamintuan was required to produce some

_____

employees of the hospital indicating that they may have been the victims of discrimination. Nanticoke Memorial disputes this evidence. As the District Court correctly noted, because of the temporal remoteness of the segregation, the failure to produce the study, and the absence of any connection between the individuals involved in the alleged discrimination and those involved in the review of Dr. Pamintuan's performance, most, if not all, of this evidence would not be admissible at trial.

12

evidence that would demonstrate that Nanticoke Memorial intentionally discriminated against her because she belonged to an "identifiable class[ ] of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." See St. Francis College, 481 U.S. at 612, 107 S. Ct. at 2028.12

Once Dr. Pamintuan established her prima facie case, the burden shifted to Nanticoke Memorial to provide legitimate non-discriminatory reasons for the suspension of Dr. Pamintuan's privileges. If Nanticoke Memorial was able to provide such justification, the burden reverted back to Dr. Pamintuan to provide some evidence that these reasons were pretextual. We have previously stated that, on this point:

> [T]o avoid summary judgment, the plaintiff 's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). We continued to note that the plaintiff cannot rely on a showing that "the employer's decision was wrong or mistaken" because the focus of the factual dispute is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Id. at 765 (citations omitted). This means that the plaintiff must

> demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationallyfind them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." While this standard places a

_____

12. Because our analysis turns on other areas, we will assume, without deciding, that Dr. Pamintuan presented a prima facie case of discrimination.

13

difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs."

Id. (citations omitted). With this standard in mind, we turn to the specifics of this case.

First, we must determine whether Nanticoke Memorial proffered legitimate, non-discriminatory reasons for its decision to suspend Dr. Pamintuan. The record shows that Nanticoke Memorial engaged in a multi-level review of Dr. Pamintuan's fitness before concluding that her privileges should be suspended because of quality of care concerns. By the end of the internal review process, approximately twenty of her peers had reviewed Dr. Pamintuan's case and reached the conclusion that the suspension was justified by the fact that her behavior presented serious quality of care concerns for the patients of the hospital. Nanticoke Memorial pointed to these quality of care concerns, based on Dr. Pamintuan's pattern of inadequate record-keeping, delays in providing treatment, poor medical judgment, and disregard of hospital policies, as the reasons supporting the decision to suspend Dr. Pamintuan's privileges. In addition, Nanticoke Memorial notes that it offered a plan whereby Dr. Pamintuan could retain her privileges if she agreed to additional training and supervising. It was only after Dr. Pamintuan refused this compromise that Nanticoke Memorial took the final step of suspending her privileges.

Because Nanticoke Memorial has proffered these legitimate, non-discriminatory reasons for its disciplinary action, the burden shifts back to Dr. Pamintuan under McDonnell Douglas "to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the hospital's proffered reasons that a reasonable fact-finder could conclude that the reasons were pretextual and that the hospital had a discriminatory motive. Id. Giving Dr. Pamintuan all reasonable inferences, she cannot meet this burden.

To undermine Nanticoke Memorial's proffered reasons, Dr. Pamintuan claims that Caucasian physicians had also

14

had charting and timeliness problems, but had not been disciplined as severely as her. We note, however, that Dr. Pamintuan's suspension was not based solely on her deficiencies concerning charting and timeliness, but was grounded in large part on Nanticoke Memorial's concerns about the quality of care she was providing to the hospital's patients.

Dr. Pamintuan asserts that her own statements that she did not have significant clinical deficiencies were sufficient to create a question for the fact-finder. We have recognized that a plaintiff's own affidavit providing circumstantial evidence of discrimination may in certain cases be sufficient by itself to withstand a defendant's motion for summary judgment. See Weldon v. Kraft, Inc., 896 F.2d 793, 800 (3d Cir. 1990); Jackson v. University of Pittsburgh, 826 F.2d 230, 236 (3d Cir. 1987). However, this is not such a case.

The testimony offered by the plaintiffs in Weldon and Jackson is distinguishable from that offered by Dr. Pamintuan. In both Weldon and Jackson, the plaintiffs offered testimony that, if believed, gave clear indication that they were discriminated against and treated differently because of their race. Here, Dr. Pamintuan's testimony is essentially limited to the claim that her medical care was not deficient. Notably, she does not claim that the criticisms contained in the OB/GYN minutes were incorrect, nor does she claim that the internal review process produced findings that were untrue. Rather, her deposition testimony merely asserts that the decision regarding her competence as a physician was wrong. As noted, Dr. Pamintuan cannot survive summary judgment simply by alleging that Nanticoke Memorial's decision was "wrong or mistaken." Fuentes, 32 F.3d at 765. Therefore, these two cases do not further our analysis beyond standing for the fact that, in some cases, a plaintiff 's testimony may be sufficient to proceed past summary judgment. However, were we to find that testimony such as Pamintuan's was sufficient to survive summary judgment on the issue of pretext, we would undermine the entire McDonnell Douglas framework by drastically limiting the possibility that summary judgment could be granted

15

because virtually any contrary testimony by a plaintiff would preclude a grant of summary judgment to the defendants.

Dr. Pamintuan also alleges that she is entitled to an inference of pretext because the hospital did not conduct a comparative review evaluating her performance in comparison to that of other physicians at the hospital. This argument fails because she has not alleged or offered any evidence that any other physicians were granted a comparative review when facing disciplinary proceedings. So, rather than complaining that she was treated differently from others because of her race, she appears to be complaining that she was not treated differently. Indeed, Dr. Pamintuan was accorded the same review process that all Nanticoke Memorial physicians received. The extensive multi-tiered review process went on for several months. Dr. Pamintuan was allowed to present evidence and make arguments at all the appropriate procedural times. While Dr. Pamintuan may claim that a comparative review would have benefitted her cause, the lack of such a review does nothing to support her argument that she was discriminated against based on her race.

Dr. Pamintuan's evidence was, for the most part, anecdotal and inadmissable. Much of the evidence related to events that occurred several years before any action was taken against her.13 In short, Dr. Pamintuan has pointed to no substantial evidence that contradicts or undermines Nanticoke Hospital's legitimate reason for her suspension -- concern about the quality of care that she was providing.

Thus, Dr. Pamintuan has failed to submit evidence from which a reasonable factfinder could conclude that Nanticoke Memorial's proffered legitimate, non-discriminatory reasons for her suspension were pretextual. Dr. Pamintuan was accorded a lengthy and intense review process. Throughout the process, she was treated the same

_____

13. The District Court correctly noted that much of the evidence relied on by Dr. Pamintuan to show pretext would not be admissible at trial. Therefore, it is not proper to consider such evidence on summary judgment. See Pamintuan, 1998 WL 743680, at *11 (citing Wetzel v. Tucker, 139 F.3d 380, 383 n.2 (2d Cir. 1998)).

16

as any other physician. Although she contends that the ultimate decision reached by her peers was incorrect, more must be shown to survive summary judgment. Therefore, we affirm the District Court's grant of summary judgment to Nanticoke Memorial on her various claims of racial discrimination.14

III.

Dr. Pamintuan's final contention is that the District Court erred when it held that Nanticoke Memorial was immune from damages for the alleged violations of state law under the Health Care Quality Improvement Act, 42 U.S.C. S 11101 et seq. ("HCQIA").15 Under the HCQIA, a health care provider is immune from suit brought as the result of a "professional review action,"16 see 42 U.S.C. S 11111(a), if the review action was undertaken:

> (1) in the reasonable belief that the action was in the furtherance of quality health care,

> (2) after a reasonable effort to obtain the facts of the matter,

_____

14. In light of our finding that Dr. Pamintuan failed to provide sufficient evidence that Nanticoke Memorial's proffered reasons were pretextual, we need not address her argument that she was qualified as an employee for Title VII purposes. The District Court ruled that she did not qualify as an employee, and so lacked standing to bring a Title VII suit. However, even if we were to favor Dr. Pamintuan's argument that she did in fact qualify as an employee under Title VII, her Title VII suit would also fail because it is subject to the same shifting burdens test that her section 1981 suit failed to fulfill.

15. The HCQIA immunity provisions do not cover damages under section 1981. See 42 U.S.C. S 11111(a)(1).

16. A "professional review action" is defined as:

> an action or recommendation of a professional review body which is taken or made in the conduct of a professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. S 11151(9).

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedure as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for [immunity] unless the presumption is rebutted by a preponderance of the evidence.

42 U.S.C. S 11112(a) (emphasis added). Therefore, under the HCQIA, Dr. Pamintuan had the burden of establishing that the hospital did not meet the standard for immunity. See Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 839 (3d Cir. 1999). In other words, the HCQIA alters the summary judgment burden because Dr. Pamintuan, the non-mover for summary judgment, had the burden of demonstrating that a reasonable fact finder could find by a preponderance of the evidence that Nanticoke Memorial had not met the above requirements and had acted unreasonably. The District Court found that she failed to meet this burden. We agree.

In the District Court, Dr. Pamintuan argued that Nanticoke Memorial's refusal to undertake a comparative analysis by examining the records of other physicians, and its refusal to credit the testimony of her expert, Dr. Dyer, sufficiently rebutted the statutory presumption. Dr. Pamintuan also argues that the District Court'sfinding that she had stated a claim for racial discrimination should entitle her to survive summary judgment because a decision based on race is per se unreasonable.

We judge Nanticoke Memorial's actions using an objective test, thus the good or bad faith (or subjective motivations) of the reviewers is irrelevant. See id. at 840. The "reasonable belief " standard is satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent

18

behavior or would protect patients." Id. (citations and internal quotation marks omitted). Thus, Dr. Pamintuan's argument that her allegations of discriminatory motivation are sufficient to rebut the presumption of immunity under the HCQIA is incorrect. Instead, under the first prong, Dr. Pamintuan must show that the totality of the information available to the Nanticoke Memorial reviewers did not provide a basis for a reasonable belief that their actions would further quality health care. Dr. Pamintuan failed to make such a showing. Because the inquiry was reasonable, and a reasonable factfinder could not find an absence of a reasonable basis for the actions of Nanticoke Memorial and the Committee, the District Court correctly held that the HCQIA precluded the award of state law damages to Dr. Pamituan.

Dr. Pamintuan's arguments actually address the second requirement -- "after a reasonable effort to obtain the facts of the matter." First, she claims that the review was unreasonable because Nanticoke Memorial refused to consider the records of other OB/GYNs at the hospital. The Ninth Circuit Court of Appeals has previously dealt with this argument under the HCQIA. See Smith v. Ricks, 31 F.3d 1478 (9th Cir. 1994). The court stated:

> [The doctor's] challenge to [the] investigation is that he was not permitted to discover or introduce evidence regarding the conduct of other doctors. [The doctor] essentially claims he was not the worst doctor at[the hospital]. However, nothing in the statute, legislative history, or case law suggests the competency of other doctors is relevant in evaluating whether [the hospital] conducted a reasonable investigation into [a doctor's] conduct.

Id. at 1486 (emphasis added). We agree with the Ninth Circuit Court of Appeals. The focus of our inquiry under the HCQIA is not whether Dr. Pamintuan was or was not a substandard doctor in comparison to the other OB/GYNs at Nanticoke Memorial, but whether Nanticoke Memorial's disciplinary actions were justified after a reasonable effort to obtain the facts of the matter. It was not necessary for

19

the hospital to gather evidence of other doctors' records to fulfill the reasonable fact gathering requirement. 17

Looking at the "totality of the process leading up to" Nanticoke Memorial's professional review action, it is clear that the hospital made a reasonable effort to obtain the facts of the matter. Matthews v. Lancaster Gen. Hosp., 87 F.3d 624, 637 (3d Cir. 1996). The lengthy review process took place in front of several evaluators over a period of several months. The inquiry culminated with approximately twenty-five hours of hearings before Nanticoke Memorial's Judicial Review Committee. Dr. Pamintuan was allowed to present all of her evidence and arguments before the Judicial Review Committee made its decision. Because the inquiry was reasonable, and a reasonable fact finder could not objectively find that either Nanticoke Memorial's or the Committee's actions were not motivated by a reasonable belief that the actions would be in furtherance of quality health care, the District Court correctly held that the HCQIA precluded the award of state law damages to Dr. Pamintuan.

IV.

Because Dr. Pamintuan failed to provide sufficient evidence that Nanticoke Memorial's decision to suspend her privileges was pretextual and because she failed to rebut the presumption of immunity under the HCQIA, we affirm the District Court's grant of summary judgment to Nanticoke Memorial.

_____

17. Dr. Pamintuan's other challenge to Nanticoke Memorial's fact gathering process is that the hospital improvidently rejected the testimony of her expert, Dr. Dyer. In her brief, Dr. Pamintuan claims that the Dr. Dyer's testimony was precluded by some objection by Hospital counsel. Appellant's Brief at 28. However, looking at the record, it appears that the Hospital Committee simply chose not to adopt her expert's testimony and suggestions to use more cases for evaluation.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit