758 A.2d 1090

**Carol L. BENDER**

v.

**SUBURBAN HOSPITAL, INC. et al.**

**No. 2000, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Sept. 7, 2000.

8

10

Melvin J. Sykes, Baltimore, for Appellant.

Jonathan B. Sprague (A. James Johnston, Adrian R. King, Jr., Philadelphia, PA and S. Allan Adelman, Rockville, on the brief), for Appellees.

Jerome G. Geraghty, Theresa M. Kelly, and Blades & Rosenfeld, P.A., Baltimore, for Amicus Curiae, Suburban Hosp., Inc. in support of Appellee.

Joseph A. Schwartz, III, Pamela Metz Kasemeyer and Schwartz & Metz, P.A., Baltimore, for amicus curiae, the Medical and Chirurgical Faculty of Maryland.

Argued before MOYLAN, DAVIS and THIEME, JJ.

THIEME, Judge.

This is an appeal from a summary judgment in favor of appellees, Suburban Hospital, Inc., and William Minogue, M.D., Suburban's Senior Vice President for Medical Affairs. Appellant Dr. Bender's complaint alleged that Suburban breached a contract of employment by terminating her clinical privileges and that both defendants defamed her and intentionally interfered with contractual relations and prospective advantage. The complaint prayed for injunctive relief and damages.

The trial court first granted partial summary judgment for Suburban on the breach of contract count. It found that Suburban's Medical Staff Bylaws, which guarantee that "[m]edical staff membership status and clinical privileges shall be granted or denied without regard to sex," did not create an enforceable obligation.

The court later disposed of the other counts on final summary judgment, finding that the Health Care Quality Improvement Act ("HCQIA"), 42 U.S.C. § 11111 *et seq.* (1994), renders appellees immune from suit. It entered final judgment in favor of appellees on all counts on September 10, 1999, and this appeal duly followed. Dr. Bender asks:

1. Did the court below err in granting summary judgment for defendants, even though the HCQIA affords qualified immunity only from liability for damages, and Dr. Bender also sought injunctive relief? [1]

---

**1.** Two parties submitted *amicus curiae* briefs raising questions that we will address at the threshold before we consider the immunity issues in

2. Did the court below err in finding that the HCQIA bars Dr. Bender's damage claims on the ground that the evidence failed to raise a jury question as to whether

a. Suburban made "a reasonable effort to obtain the facts of the matter," as required by 42 U.S.C. § 11112(a)(2);

b. The action against Dr. Bender was taken in the reasonable belief that it was "in furtherance of quality health care," as required by 42 U.S.C. § 11112(a)(1); and

c. The action against Dr. Bender was taken in the reasonable belief that it was "warranted by the facts known after . . . reasonable effort to obtain [the] facts," as required by 42 U.S.C. § 11112(a)(4)?

3. Did the trial court err in holding that Article II, Section C of Suburban's Medical Staff Bylaws did not create an enforceable contractual obligation?

We answer "no" to these questions and explain.

### Facts

Dr. Carol Bender held clinical privileges continuously at Suburban Hospital from 1977, when she first started practicing internal medicine, until February 21, 1996. Appellees concede her clinical competence, and no patient has ever complained about the quality of her care. Despite the present controversy, many fellow health care providers attest that they hold Dr. Bender in high regard. She retains privileges

---

Dr. Bender's questions. The Medical and Chirurgical Faculty of Maryland ("MedChi"), Maryland's medical society, asks whether a peer review entity such as Suburban has an affirmative duty to consider, fully investigate, and make detailed findings as to allegations of sexual discrimination in order to satisfy the four-prong test required for immunity under the HCQIA. In response, the Maryland Hospital Association ("MHA") asks whether the peer review committee is barred by Maryland's Medical Review Committees statute, Md.Code (1981, 1994 Repl.Vol., 1999 Cum.Supp.), § 14–501 of the Health Occupations Article, from making available to a physician who is the subject of a review proceeding information about other peer-reviewed physicians, when the subject physician asserts that she is being treated in a disparate and discriminatory manner.

at Shady Grove Adventist Hospital in Gaithersburg and teaches at the George Washington School of Medicine. She has held leadership positions in the Montgomery County Medical Society and the Montgomery delegation to the Medical and Chirurgical Faculty of Maryland, which she represents on the State Board of Physician Quality Assurance. This board, we note, examines, licenses, supervises, and disciplines Maryland's physicians.

Despite her excellent professional reputation, Dr. Bender's relationships with fellow health care providers at Suburban have been troubled. Appellees cite reports dating from the early 1980's documenting Dr. Bender's rough language and obstreperous behavior and official warnings that had been issued. Despite these incident reports, the hospital reappointed Dr. Bender, with caveats about her behavior, for 1989 and 1990.[2] In November 1990, however, she was reappointed without caveats for 1991 and 1992. On June 17, 1992, Dr. Bender applied for reappointment for 1993 and 1994. Both Dr. James Wilson, the chairman of internal medicine, and Dr. Harris Kenner, the chairman of the Department of Medicine, recommended Dr. Bender's reappointment.

A short time later, Dr. Bender was summoned to a meeting with Doctors Kenner; John Saia, chairman of the Medical Staff; Ira Miller, chairman-elect of the Medical Staff; and Frederick Caldwell, Senior Vice President for Medical Affairs. All four physicians were members of the Medical Staff Executive Committee ("MEC") and, as a group, they constituted, according to testimony, an informal credentialing subcommit-

---

**2.** The hospital confers staff privileges on a two-year basis. Dr. Bender's reappointment letter of February 2, 1989, warned:

There have been problems in the past associated with attitude towards nurses....

It was felt that these problems did not at this time justify the denial of your application for reappointment. However, if these problems continue, or if there are any further problems during the next two years, it may be necessary to take appropriate action which could include suspension or termination of your medical staff privileges or refusal to reappoint you to the medical staff at the end of your present two-year appointment.

tee that convened on infrequent occasions. Before the meeting, Dr. Kenner told Dr. Bender that a "serious" threat to her hospital privileges existed.

At the meeting, which took place on October 22, 1992, the committee presented Dr. Bender with a long list of the incident reports lodged in her quality assurance ("QA") file. Testimony showed that several of these reports may have been trivial or retaliatory in nature.[3] We also note that all incidents before November 1990 (the most recent of which occurred in March 1988) had been reviewed by the hospital when Dr. Bender renewed her privileges for 1991 and 1992, and, at that time, they presented no problem.

The incidents for 1991 include an "altercation" with a member of the nursing staff. The report reveals, however, no accusations of abusive, vulgar or hostile words on Dr. Bender's part, and, in fact, the handwritten transmittal note shows intent on the part of the Administrator of Nursing to diminish Dr. Bender's reputation.[4] Dr. Bender received no notice of this report until the October 22 meeting. Reviewing physicians, including Doctors Kenner and Wilson, found that the incident raised no major quality assurance issues.

---

**3.** According to hospital and third party testimony, any physician or hospital employee may file such reports, and often it appears that hospital personnel prepare petty incident reports as a way to punish those physicians for whom they harbor personal enmity. For example, a member of the nursing staff filed a report accusing Dr. Bender of opening a box of doughnuts belonging to nursing personnel, and another complained about the clothing Dr. Bender wore when she was paged to the hospital on a Saturday morning. Hospital managers acknowledged that frequently physicians were not informed about or given an opportunity to respond to unfavorable incident reports such as these. Dr. Bender, in fact, was unaware of several of the reports until the meeting with the informal credentials subcommittee. Moreover, it is the Credentials Committee's obligation to investigate incident reports for any reapplying physician for "reasonable validity," and in Dr. Bender's case, reports differ as to the degree to which that committee had examined the reports for validity. The hospital maintains the reports permanently, even beyond the informal three-year statute of limitations that the application for reappointment implies.

**4.** The note reads: "John: We couldn't let 1991 pass without at least one incident to place in Dr. B's file. Here it is!"

The second incident after 1988 occurred in August 1992, when a teenage girl of whose condition Dr. Bender had been informed was held in the Emergency Room for several hours. Without notifying Dr. Bender that the girl had arrived, emergency personnel subjected her to several procedures, including tests for HIV and sickle cell anemia, a CT scan, and a lumbar puncture. When Dr. Bender reached the hospital, she correctly diagnosed the girl's condition to be tonsillitis and strep throat. From some reports, Dr. Bender was visibly angry about what had happened, although no one testified that she had been abusive. As she had done before, she requested a QA review, which found that the Emergency Room had violated several applicable standards. Shortly after the incident, Dr. Paul Rothstein, chairman of the Emergency Department, wrote a bitterly worded letter to Dr. Caldwell stating:

I find Dr. Bender's behavior to be offensive, unprofessional, and personally demeaning. Unfortunately, this is characteristic behavior for her.

I am writing this letter to seek your advice and counsel in how to proceed or if to proceed any further. In my experience in dealing with attendings from all services in this hospital for nearly six years now, I find that Dr. Bender's behavior is far beyond the norm. While I cannot comment, specifically, on her medical abilities, her personal interactions are nearly uniformly found to be inappropriate. Is this the type of physician we need or want on our medical staff?

The last report involved a conversation in October 1992, between Dr. Bender and QA coordinator Mary Freeman, held in the Medical Records Department, an area of the hospital that is off-limits to patients and their families. Dr. Bender showed Freeman a patient chart and said, "You have to review this patient; her care was all fucked up." She then reviewed the patient's chart with Freeman, "using occasional expletives." Dr. Saia later asked Freeman to submit a complaint for Dr. Bender's QA file. We note, however, that several physicians, including Dr. Bender's accusers, admitted in testimony or depositions that the use of foul language, even in the

presence of patients, was almost a way of life for some male physicians at Suburban.

Dr. Bender assured the ad hoc credentials subcommittee that she would work harder to respect the sensibilities of others and improve the way in which she communicated her concerns about patient care. The group concluded:

In view of the three year hiatus following a previous counseling and her stated willingness to improve her behavior, the group was willing to accept her promise and hope for a permanent improved outcome.

The rapprochement between Dr. Bender and the subcommittee, however, was fugacious. One of Suburban's surgeons, "Dr. Johnson,"[5] who was well-known for his short temper, performed emergency surgery for peritonitis, a life-threatening condition, on one of Dr. Bender's patients on October 23, 1992. The patient later wrote in a letter to the hospital that, on October 25, Dr. Johnson completely lost control, "storm[ing] into [her] room screaming at the top of his lungs" that she "would have to choose between him and Dr. Bender" as her attending physician. He also verbally assaulted the attending nurse, shouting at her within the hearing of other staff about her "confrontational manner" and "lecturing" her that "I do not work for you. I am the doctor and you work for the hospital and me and I do not want you on any of my cases." The next day, after seeing Dr. Bender writing notes at the nurses' station, Dr. Johnson again raged into the patient's room and yelled at her. He "rip[ped] the dressing off [her] abdomen" with such force that she was sure he would tear the skin and the surgical staples holding her incision together.

From the nurses' station, Dr. Bender witnessed Dr. Johnson's outburst. A fellow physician attests that

Dr. Bender did not raise her voice. She countered that she thought of herself as a good physician, that Ms. Paradis was

---

**5.** "Dr. Johnson" is an assumed name used at Suburban's request to protect the physician, who is not a litigant here.

her patient as well, and that she would continue to see the patient. Dr. Bender then walked away. She was firm in her response to Dr. Johnson's verbal onslaught. . . .

I have never seen Dr. Bender exhibit conduct similar to that of Dr. Johnson. As I stated earlier, Dr. Bender is a good doctor who in my experience has never compromised the care of her patients.

Dr. Bender notified Dr. Kenner about the incident, and he advised her to continue seeing the patient, but to refrain from writing any orders.

Doctors Caldwell, Saia, and Kenner summoned Dr. Bender to a meeting on November 25 in order to discuss the incident with Dr. Johnson. Dr. Johnson refused to talk while Dr. Bender was present, so she left, unwillingly, while he gave his version of events. Immediately after the meeting, however, Dr. Caldwell prepared a summary stating that "in the patient's room and later on the nursing station" the "two physicians argued loudly with each other in the hearing of nursing staff, patients, and visitors," and that "both physicians had acted inappropriately in having an argumentative outburst publically [*sic*] over these issues and [the three senior physicians] so advised both physicians." Dr. Caldwell contacted none of the witnesses to the incident—not even the patient—before he filed the report. Nevertheless, his report became the official version filed in Dr. Bender's QA file. A nurse's note was also placed in the file, with Dr. Johnson's name redacted, that made it appear that Dr. Bender was actually the ill-behaving physician. Additionally, Dr. Kenner asked Dr. Bender not to file an incident report because Dr. Johnson was already in trouble with his department chairman. The hospital took no action to deny or abridge Dr. Johnson's privileges.[6]

---

6. Dr. Miller, the chairman of the Medical Staff, distinguishes Dr. Johnson's behavior from that of Dr. Bender:

Dr. Johnson has an entirely different pattern of behavior. I am aware of it when he first came onto the hospital staff, he was very irascible and very difficult, and he has continued to improve as the

On November 20, Suburban's Credentials Committee met to consider Dr. Bender's application for reappointment. The minutes imply that the committee agreed to recommend Dr. Bender's reappointment but voted to warn her that "any subsequent problems would be reviewed immediately and could result in termination of her privileges." On December 1, however, the MEC, which included Dr. Rothstein and all members of the Credentials Committee, opined that, in light of the official summary of the Dr. Johnson incident, Dr. Bender "possibly was an impaired physician." [7] Because the Medical Staff chairman had doubts as to whether Dr. Bender was actually impaired and because hospital bylaws empower only the Credentials Committee to order a psychiatric evaluation, Dr. Bender's application was ultimately remanded to Credentials. Credentials promptly ordered that she be evaluated at Suburban's expense by Dr. William Flynn, a Georgetown University psychiatrist who treats impaired physicians.

Dr. Flynn examined Dr. Bender on February 19, 1993. Before the examination, Suburban transmitted to him a copy of her QA file, including the material on the Dr. Johnson incident. Suburban asked for Dr. Flynn's help in changing, or at least understanding, Dr. Bender's behavior. Dr. Flynn found that, although Dr. Bender took seriously the potential threat to her career that Suburban's cancellation of her privileges would pose,

> [w]hen we tried to discuss the overall impact of all the instances and her manifestation of a continuing inability to recognize the reactions of others to her behavior she gave evidence that she did not really "tune in to" other people's feelings or responses. Although the average person would

---

years have gone by. His behavior in contradiction to Dr. Bender has shown a marked, steady improvement, and when he is caught up having gone off the deep end, he has insight, he says, yes, I screwed up, I was out of line, and that, I think, is a very significant difference.

7. We note that the MEC met the same day that Dr. Rothstein wrote his letters to the Hospital Quality Improvement Committee justifying the Emergency Department's care in the two cases about which Dr. Bender had raised questions.

learn from such confrontations, it appeared that Dr. Bender does not learn and that she becomes so defensive she does not allow herself to consider the information being given her and therefore her behavior does not change. She is not terribly disturbed by her behavior, although the possible ·consequences have become a concern.

In his report, Dr. Flynn referenced the incident with Dr. Johnson, labeling Dr. Bender's behavior then as "inappropriate." Dr. Flynn recommended that Dr. Bender be required to engage in a course of psychotherapy "aimed at insight and behavior change," to be monitored by him or "a similar consultant who would be in communication with Dr. Bender's therapist and with the Credential's [sic] Committee." He conceded, however, that she was not "impaired" within the customary meaning of that term. Moreover, Dr. Flynn was informed at a hospital hearing, see infra, that witness reports showed that Dr. Bender's reaction to Dr. Johnson's tantrum was quite restrained. The following exchange occurred:

[APPELLANT'S COUNSEL]: Isn't it true … she did exactly that, she walked out?

[DR. FLYNN]: Is that true? That is good.

In response to Dr. Flynn's report, and after hearing from Dr. Bender and her personal psychiatrist, Dr. Milton Glatt, the Credentials Committee approved a resolution on April 15 that Dr. Bender be reappointed on the condition that she agree to behavioral counseling under Dr. Flynn's guidance. The MEC ratified this recommendation, noting the "sheer number" of incidents, and so informed the Board of Trustees.

Dr. Bender contested the requirement that she receive behavioral counseling, because of the harm it might bring to her professional standing. Citing Medical Staff Bylaws, she requested a hearing, which allowed her privileges to continue through the hospital's fact-finding and review processes. A hearing panel including Doctors Antoni Goral, John Eng, Richard Pollen, and Donald Fontana was appointed. The hearing commenced on January 4, 1994, and it continued for eight evening sessions spread over several months. The panel heard from Dr. Bender; witnesses supporting her; those

witnesses put on by the Medical Staff, including nurses that Dr. Bender had intimidated; and Dr. Rothstein, who addressed Dr. Bender's clashes with Emergency Department personal. It also heard some testimony regarding possible discrimination on the basis of gender and religion.[8] On January 26, 1995, the panel upheld the MEC's basic conclusion that Dr. Bender must undergo behavioral counseling, finding that the committee had "performed their functions exhaustively as to Dr. Bender's reappointment application." Dr. Pollen testified at deposition that the panel had been impressed by "the volume of complaints and the severity of complaints," noting that, although some incident reports seemed trivial, "the whole is bigger than the sum of its parts."[9] Dr. Pollen also averred that Dr. Rothstein's complaints about Dr. Bender had been taken at face value—"I mean, this is the Chairman of the Department of Emergency Medicine"—despite her within-channels inquiries about the care received by some of her patients.

Meanwhile, because she believed she was being dealt with according to a different standard than her male colleagues,

---

**8.** Commenting that Dr. Bender asserted she was a victim of discrimination as a defense mechanism to avoid addressing legitimate behavioral issues, the panel dismissed such allegations in its report. To be fair, however, it appears that members of the panel may have sought to suppress some of these issues during testimony before the panel. For example, when Dr. Saia admitted that male physicians were not always written up for using foul language, the panel chairman sustained an objection to the line of questioning, because "it does not speak to the total issue ... relevant to this case." At another point, the chairman sustained an objection to counsel's questioning on the incident with Dr. Johnson because it focused too much on that doctor's behavior rather than the behavior of Dr. Bender. The Maryland Commission on Human Relations, however, considered such evidence when it issued its findings.

**9.** One of Dr. Bender's witnesses, who was in practice with Dr. Pollen, averred that he had for some time before the hearing expressed a longstanding dislike for her and made negative comments about her. When deposed for this case, Dr. Pollen testified that he was "very sympathetic with Dr. Bender" and harbored "no negative feelings about her whatsoever." We note, however, Dr. Bender did not object to Dr. Pollen's selection as a member of the hearing panel.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Dr. Bender filed gender discrimination charges against Suburban with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Human Relations in August 1993. As the hearing panel was concluding its work, Suburban sought to have those proceedings dismissed and procured an agreement with Dr. Bender contemplating full privileges in exchange for dismissal and release of those charges. Dr. Bender signed this agreement on April 4, 1995, but, when Suburban's president failed to execute it immediately,[10] she withdrew her assent on April 7 and refused to dismiss her discrimination claims.

On April 4, 1995, the MEC considered the hearing panel's report and noted:

[T]here have been no reports of behavioral problems in the Hospital by Dr. Bender since 1992. Accordingly, the goal of the Medical Staff Executive Committee which was to improve Dr. Bender's behavior in the Hospital at this time appears to have been accomplished. . . .

[B]ased on the fact that there had been an extended period of time without Dr. Bender's having further problems, and that Dr. Bender had made a commitment to avoid problems in the future, it was not necessary to continue to insist on behavioral counseling as a condition to reappointment.

Any recommendation . . . should not in any way be interpreted as a reversal of [the committee's] earlier position or a rejection of the recommendations which have been made by the Hearing Panel. Rather, it is a recognition that through the review process, Dr. Bender has apparently gained some awareness of the effect her conduct has on others and developed a willingness to avoid problems in the future.

The Committee added, however, that "any further significant incidents involving Dr. Bender's behavior . . . should be dealt

---

10. A letter from Suburban's president to Dr. Bender dated April 27, 1995, offers her a fully signed agreement already ratified by the Board of Trustees.

with promptly and further action, including termination of privileges, may be appropriate."

On April 26, the Board of Trustees voted to reappoint Dr. Bender without behavioral counseling, but only if she agreed to confirm before May 1 her willingness to dismiss the discrimination claims. Dr. Bender failed to do so, and on May 2, after reconsideration of all case materials, the MEC reinstated the requirement for behavioral counseling. The only thing that changed, we note, between the committee's vote on April 4 and its vote on May 2, was that Dr. Bender had decided not to give up her legal claims against the hospital, as Dr. Kenner so testified at deposition:

Q: Okay. So now the only thing that has changed between April and May is whether Dr. Bender did or did not sign that agreement.

[APPELLEE'S COUNSEL]: I object.

Q: You can go ahead and answer it.

A: Well, because it had great significance, it had great sort of psychological significance to me. It meant to me that she really wasn't interested in changing, she wasn't willing to make the commitment. So it had psychological import to me and I think other members of the Executive Committee. It was, "There goes Carol again. She's off and ready to manipulate us in some other way."

On November 15, 1995, the Maryland Commission on Human Relations found probable cause that Suburban had discriminated against Dr. Bender because she was a woman. Its findings were based, *inter alia,* upon a review of other physicians' QA files and disciplinary histories and the statements of other Suburban physicians. The Commission found evidence that similarly situated male physicians were disciplined less severely than Dr. Bender, if at all, when their conduct was similar or even quite worse. Neither were they held to the same standard as Dr. Bender for the renewal of privileges, even when there existed significant patient care issues, which were not present in Dr. Bender's case. Further, the investigation noted that similarly situated male physicians did not

lose privileges unless they endangered patients or were already under psychiatric care.[11]

On February 21, 1996, the Board of Trustees took final action, denying Dr. Bender's reappointment, after it reviewed Dr. Flynn's report, the various reports and recommendations of the Credentials and Medical Executive Committees, and the findings of the anti-discrimination agencies.[12] The Board justified its decision as follows:

[I]t was the consensus of a majority of the Board of Trustees that Dr. Bender had a long history of disruptive and abusive conduct in the Hospital. Although there had been no recent episodes of disruptive conduct while the peer review proceedings had been pending, it was felt that Dr. Bender did not recognize and acknowledge her disruptive conduct and the significant impact it had on Hospital operations. Moreover, it was felt that there was insufficient evidence that such problems would not reoccur in the future, particularly in light of Dr. Bender's refusal to obtain professional counseling to deal with her behavior problems as had been recommended. . . .

The Board's action was reported to the National Professional Data Bank, where its presence would alert other hospitals where Dr. Bender might seek privileges to her problems at Suburban. The Maryland Board of Physician Quality Assurance also received a report, investigated the case thoroughly, and concluded that events warranted no action against Dr. Bender's license.

_____

11. It is possible to draw some of the same conclusions from reading the transcript of the hospital's hearing. For example, during the hospital's hearing, one physician testified that Suburban "had residents that we didn't throw out of the program that were caught selling drugs, and writing prescriptions. . . . I know doctors on the staff within the past two years that have had major felonies, and that are still here in the hospital." Various witnesses also testified that abuse and "blue" language is relatively common among doctors—"If you cry every time some doctor screams at you, you're going to be in tears a lot."

12. The Board did not review the transcript of proceedings before the hearing panel, nor did it examine Dr. Bender's QA file or the summary of incidents that had been prepared.

As for the sex discrimination claims, both the State and federal claims ultimately failed because Dr. Bender was not an employee of Suburban within the statutory definition and thus did not qualify for protection against employment discrimination. The EEOC dismissed Dr. Bender's claim on July 3, 1995, and she challenged that finding in United States District Court. *See Bender v. Suburban Hosp.*, 998 F.Supp. 631 (D.Md.), *aff'd*, 159 F.3d 186 (4 th Cir.1998); *see also* 42 U.S.C. § 2000e–2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"). Likewise, her State claim ultimately failed, despite favorable initial findings by the Maryland Human Relations Commission. *See Maryland Comm'n on Human Relations v. Suburban Hosp.*, 113 Md. App. 62, 686 A.2d 706 (1996), *vacated*, 348 Md. 413, 704 A.2d 445 (1998); *see also* Md.Code (1957, 1998 Repl.Vol., 1999 Cum.Supp.), Art. 49B § 16 ("It shall be an unlawful employment practice for an employer . . . [t]o fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, age, national origin, marital status, or disability unrelated in nature and extent so as to reasonably preclude the performance of the employment"). In the federal Title VII case, Dr. Bender had joined common law claims for defamation, breach of contract, intentional inference with contractual relations, and intentional interference with prospective economic advantage. These claims were dismissed without prejudice, and Dr. Bender filed the suit *sub judice* in the Circuit Court for Montgomery County. After that court granted Suburban's motions for summary judgment, Dr. Bender noted the present appeal.

## Discussion

Dr. Bender presents in this action what may be a legitimate gripe; to her misfortune, no legally cognizable means of

redress exists. Each side's guided tour of the record extract and our own examination of the same show that Dr. Bender put patient welfare above all else but often expressed her strong preferences and opinions in ways that badly offended the sensibilities of others. For this reason, some staff persons and reviewing physicians at Suburban Hospital may have harbored personal animus against Dr. Bender, and indeed, they might have held her to a higher standard of comportment than that to which they would hold a male physician. Clearly, her professional reputation has suffered because of Suburban's de-credentialing. The HCQIA, however, severely constrains the courts' ability to grant relief.

█ This action is the most recent of Dr. Bender's efforts to obtain relief. Both the United States Court for the District of Maryland and the Circuit Court for Montgomery County determined that federal and State employment discrimination statutes do not apply. *See Bender,* 159 F.3d at 190–91; *Comm'n on Human Relations,* 113 Md.App. at 91, 686 A.2d 706. Dr. Bender thus turned to the common law, seeking to have a jury decide her cause in contract and in tort. Congress has decided, however, that charges of personal animus or subjective bias—even that which would be considered illegal in the context of employment—are irrelevant when challenging a medical peer review process, if the reviewing committee other-wise acted within the HCQIA's guidelines for immunity. In its *amicus* brief, MedChi claims that the HCQIA implies an affirmative duty to investigate and consider allegations of discrimination in order to satisfy its standards for the grant-ing of immunity. In reply, MHA and, arguing in the alterna-tive, Suburban, claim that, even if MedChi is right, Maryland's own medical review committee statutes, Maryland Code (1981, 1994 Repl.Vol., 1999 Cum.Supp.), §§ 14–501 & 14–504 of the Health Occupations Article, prohibit the use of *other* physi-cians' files related to the granting of privileges in an investiga-tion for the purpose of establishing a pattern of discrimination. We begin by addressing the issues raised by the *amicus curie* briefs, which must be resolved at the threshold, then we turn to appellant's questions presented.

## I

The court below based its decision on its reading of the HCQIA, which grants professional reviewing bodies, their members, staff, and contractors immunity from damages for professional review actions, including negative evaluations that might affect clinical privileges. *See* § 11111(a); § 11151(9). Immunity attaches if a professional review action is taken

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

§ 11112(a).

The HCQIA specifically exempts from immunity causes of action under "any law of the United States or any State relating to the civil rights of any person or persons, including the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* and the Civil Rights Acts, 42 U.S.C. § 1981, *et seq.*" In her unsuccessful cases preceding the action *sub judice,* Dr. Bender sued appellees under the Civil Rights Act of 1964 and Maryland employment discrimination statutes. Had her association with Suburban fallen within the statutory definition of employment, these actions would have gone forward and Suburban's reviewers would not now enjoy immunity. MedChi argues that, in addition to providing a specific exemption from immunity for certain statutory causes of action, this clause implies an affirmative duty for review committees to investigate fully, perhaps with even greater vigor than the normal fact-finding process, any allegations of discrimination a physician might present during peer review. Because Dr. Bender was unable to find relief under employment discrimination statutes, MedChi stresses that "the only place where she can present a case

of sex discrimination is the peer review process mandated by HCQIA," for "[t]here appears to be no forum for a female physician, even one with an unassailable claim of sex discrimination, to bring action against a Maryland hospital."

We cannot, however, adopt the interpretation that MedChi claims underlies the plain language of the HCQIA. Although MedChi's contention that a female physician has no freestanding cause of action for sex discrimination against a hospital that denies her privileges may be true and, if so, is troubling indeed, this Court's proper role does not encompass filling those voids that the legislature left unfilled in derogation of clear statutory language. To be sure, the HCQIA was intended to exclude from immunity those parties who illegally discriminate against other physicians or seek to suppress competition,[13] and Congress included specific statutory provisions intended to address those policy goals. As a state court, however, we are chary of overreaching clearly expressed congressional intent, especially when federal courts thus far have been unwilling to do so.

■■■■ Federal and Maryland cases support our position that the HCQIA entitled Dr. Bender's case to reasonable but not heightened scrutiny, regardless of the accusations of wrong-doing she made.[14] Under the HCQIA, the reviewing body must meet a standard of objective reasonableness, based upon the totality of the circumstances, *Pamintuan v. Nanticoke Mem. Hosp.*, 192 F.3d 378, 389 (3d Cir.1999); *Imperial v. Suburban Hosp. Ass'n*, 37 F.3d 1026, 1030 (4th Cir.1994); *Goodwich v. Sinai Hosp. of Baltimore, Inc.*, 343 Md. 185, 208, 680 A.2d 1067 (1996), and not on a subjective standard of good

---

**13.** Representative Waxman, a principal sponsor of the Act, stated: "The immunity provisions have been restricted so as to not protect illegitimate actions taken under the guise of furthering the quality of health care. Actions that violate civil rights laws or actions that are really taken for anti-competitive purposes will not be protected under this bill." 141 Cong. Rec. H9957 (Daily Ed. Oct. 14, 1986).

**14.** Section III, *infra*, will apply this standard to the instant facts.

faith.[15] *Austin v. McNamara,* 979 F.2d 728, 734 (9 th Cir.1992) (citing legislative history of § 11112(a)). Objective reasonableness does not imply that the peer review committee's process is perfect or even correct in every respect. *See, e.g., Imperial,* 37 F.3d at 1030 ("even if Imperial could show that these doctors reached an incorrect conclusion on a particular medical issue because of a lack of understanding, that does not meet the burden of contradicting the existence of a reasonable belief that they were furthering health care quality in participating in the peer review process"); *Perez v. Pottstown Memorial Medical Center,* No. CIV. 97–3334, 1998 WL 464916, at *10 (E.D.Pa. Aug. 3, 1998) ("The court is mindful that '[p]laintiff is entitled to a reasonable investigation under the [HCQIA], not a perfect investigation.'") (quoting *Sklaroff v. Allegheny Health Educ. Research Found.,* No. Civ. A. 95–4758, 1996 WL 383137, at *8 (E.D.Pa. July 8, 1996) (citations and internal quotation marks omitted), *aff'd,* 118 F.3d 1578 (3d Cir.1997)), *aff'd,* 210 F.3d 358 (3d Cir.2000); *Goodwich,* 343 Md. at 212, 680 A.2d 1067. Instead, the sole issue here is whether the basis for Suburban's challenged professional review action is in the main sufficient. *See Brader v. Allegheny Gen. Hosp.,* 167 F.3d 832 (3d Cir.1999). The objective reasonableness standard is thus satisfied " 'if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients.'" *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 635 (3d Cir.1996) (quoting H.R.Rep. No. 99–903, at 10). As long as Suburban's peer review bodies had enough information to justify the denial of her reappointment, it is irrelevant to

---

**15.** The legislative history explains:

> Initially, the Committee considered a "good faith" standard for professional review actions. In response to concerns that "good faith" might be misinterpreted as requiring only a test of the subjective state of mind of the physicians conducting the professional review action, the Committee changed to a more objective "reasonable belief" standard.

H.R.Rep. No. 99–903, at 10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6287, 6392–93.

this case whether Suburban's peer reviewers personally disliked Dr. Bender, sought to retaliate against her for criticizing the quality of care that other providers had given her patients, reneged on a not-yet-executed settlement agreement, or even seemed to hold her to a higher standard of comportment than some of her male colleagues. *See Pamintuan*, 192 F.3d at 378 (hospital immune despite some evidence of racial discrimination against Filipino physician, the failure of peer reviewers to discipline similarly situated white physicians and the hearing panel's failure to compare disciplined physician's records to those of other physicians); *see also Sugarbaker v. SSM Health Care*, 190 F.3d 905, 914 (8 th Cir.1999) ("In the HCQIA immunity context, the circuits that have considered the issue all agree that the subjective bias or bad faith motives of the peer reviewers is irrelevant."), *cert. denied*, —— U.S. ——, 120 S.Ct. 980, 145 L.Ed.2d 931 (2000); *accord Brader*, 167 F.3d at 840 (3d Circuit); *Mathews*, 87 F.3d at 635 (same); *Bryan v. James E. Holmes Reg. Med. Ctr.*, 33 F.3d 1318, 1335 (11 th Cir.1994), *cert. denied*, 514 U.S. 1019, 115 S.Ct. 1363, 131 L.Ed.2d 220 (1995); *Austin*, 979 F.2d at 734 (9th Circuit).

 MedChi argues that Suburban deliberately suppressed Dr. Bender's discrimination claims and overrode her efforts to have peer reviewers compare her file to the files of similarly situated male physicians. This claim is not entirely true. Although the record shows that the hearing committee chairman sustained objections to Dr. Bender's attempts to introduce some testimony regarding the behavior of other physicians, *see supra* note 8, considerable testimony was allowed, overruling the objections of the Medical Staff's counsel.[16]

---

16. Hearing transcripts show, for example, that the chairman allowed Dr. Saia to testify that male physicians were not always written up for using blue language. Likewise, a female physician testified that, "if [a. woman physician] pulled off some of the stuff that some of the attendings pulled off, [she] would be fired on the spot." An emergency room clerk noted that other physicians sometimes used rough or abusive language, and a representative of the American Medical Association addressed matters of gender equality.

The hearing panel addressed this testimony in its report and concluded, based on the testimony of witnesses and the documentation, that

Moreover, the Board of Trustees, which made the final determination on Dr. Bender's privileges, took into account the probable cause findings of the Maryland Commission on Human Relations.[17] We also note that the cases Dr. Bender cites fail to support her proposition that the hospital was obligated as part of the peer review process to consider the QA records of all similarly situated male physicians. These cases go to the non-privileged nature of such records under the HCQIA for claims covered by that act's civil rights exception. Conversely, they do not create an absolute requirement that such evidence must always be considered in the face of allegations of discrimination. *See Johnson v. Nyack Hosp.*, 169 F.R.D. 550, 559–61 (S.D.N.Y.1996) (for federal racial discrimination action based on hospital's failure to reinstate African-American surgeon, no federal privilege applies to peer review materials); *LeMasters v. Christ Hosp.*, 791 F.Supp. 188, 189–92 (S.D.Ohio 1991) (federal law of privilege, *i.e.*, no privilege exists, applies to peer review materials in sex discrimination case, even if such materials would be privileged under Ohio law); *Dorsten v. Lapeer County Gen. Hosp.*, 88 F.R.D. 583, 586 (E.D.Mich.1980) (federal law of privilege applies to peer review materials in sex discrimination case, even if such

discrimination was not an issue in the case of Dr. Bender. Although the panel did not deny that gender equality issues exist at the hospital, it concluded that Dr. Bender used accusations of discrimination as a shield against having to address real behavioral issues:

Having heard the witnesses and reviewed the documentation, the Hearing Committee finds no basis for those allegations. Asserting she was the object of discrimination by others is an example of one of Dr. Bender's reactions to criticism referred to in our finding of Fact November 6. The fact that Dr. Bender's offensive behavior is often directed toward or in the presence of male staff members was noted by the Hearing Committee.

17. We note again, however, that the courts eventually determined that Dr. Bender's pleadings failed to show a cause of action for discrimination. *See Bender*, 159 F.3d at 186; *Comm'n on Human Relations*, 113 Md.App. at 62, 686 A.2d 706; *cf. Nerenberg v. RICA*, 131 Md.App. 646, 683, 750 A.2d 655 (2000) (an EEOC "Probable Cause Determination merely creates a colorable issue for litigation," but "[e]ven when the EEOC finds probable cause and issues a right-to-sue letter, summary judgment may be appropriate").

materials would be privileged under Michigan law). On the other hand, in *Pamintuan*, 192 F.3d at 389, which bears a striking similarity to the instant case, the Third Circuit held that the gathering of evidence from other doctors' records was not necessary to fulfill the requirement for reasonable fact-gathering when a disciplined physician claimed racial and ethnic discrimination. We thus reject MedChi's interpretation of Suburban's duties under the HCQIA.

Because the HCQIA did not require Suburban's peer reviewers to focus on Dr. Bender's discrimination claim or examine the QA files of similarly situated male physicians, we need not fully expound upon the theory raised by the MHA and Suburban regarding the immunity and confidentiality requirements of sections 14–501 [18] and 14–504 [19] of the Health Occupations Article.[20] We note, however, that the MHA stretches the statute. To be sure, the immunity provided by Maryland's statute might in some circumstances exceed that

---

18. Section 14–501 states in relevant part:
 (d)(1) Except as otherwise provided in this section, the proceedings, records, and files of a medical review committee are not discoverable and are not admissible in evidence in any civil action....
 (e) Subsection (d)(1) of this section does not apply to:
 (1) A civil action brought by a party to the proceedings of the medical review committee who claims to be aggrieved by the decision of the medical review committee; or
 (2) Any record or document that is considered by the medical review committee and that otherwise would be subject to discovery and introduction into evidence in a civil trial.
 (f) A person shall have the immunity from liability described under § 5–637 of the Courts and Judicial Proceedings Article for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee.

19. Section 14–504 grants civil immunity to a broad class of persons who provide "information to any hospital, hospital medical staff, related institution, or other health care facility, alternative health system, professional society, medical school, or professional licensing board" regarding a physician. § 14–504(c).

20. The MHA labels this statute the "confidentiality statute." More accurately, the short title of section 14–501 is "Medical Review Committees," and the section covers both confidentiality and civil immunity.

provided by the HCQIA, because Maryland requires that reviewers act under a good faith standard, rather than a standard of objective reasonableness. *See* Md.Code (1973, 1998 Repl.Vol.), § 5–637 of the Courts & Judicial Proceedings Article.[21] *Goodwich,* 343 Md. at 214, 680 A.2d 1067, affirms our holding in *Goodwich v. Sinai Hosp. of Baltimore,* 103 Md.App. 341, 653 A.2d 541 (1995), that heightened immunity may be possible:

> The standard under the Maryland statute is different from that under Federal law. Maryland law requires that a member of a review committee act in good faith, whereas Federal law, as noted, provides objective standards of reasonableness. Although the State law may thus appear to be inconsistent with the Federal law in that regard, it is not necessarily so. 42 U.S.C. § 11115(a) provides that "nothing in this subchapter shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action *that is in addition to or greater than that provided by this part.*" (Emphasis added).

> In practice, the State and Federal statutes may co-exist. If a medical review body's actions are performed with malice, but nonetheless are deemed to be objectively reasonable, the body will be immune under Federal law; the lack of State immunity because of the absence of good faith would be immaterial, for the Federal law would govern. If, however, the review actions are not objectively reasonable, thereby providing no Federal immunity, the court would then have to consider whether the actions were nonetheless taken in good faith, for, if they were, State immunity might exist.

---

**21.** Section 5–637(b) provides:

A person who acts in good faith and within the scope of the jurisdiction of a medical review committee is not civilly liable for any action as a member of the medical review committee or for giving information to, participating in, or contributing to the function of the medical review committee.

The State law, in other words, may, in some circumstances, provide additional immunity or protection to medical review bodies. The State law is preempted by the Federal only to the extent that it provides *less* immunity than the Federal, not to the extent it provides *more.*

*Id.* at 355, 653 A.2d 541 (citations omitted) (emphasis in original). Immunity under Maryland's statute, if granted, extends to all civil liability, *see* § 14–501(f), and not just to damages like the HCQIA. *See* 42 U.S.C. § 11111(a); *see also Imperial,* 37 F.3d at 1031–32. Additionally, Maryland's statute blankets "the proceedings, records, and files" of medical review committees with confidentiality by rendering such information non-discoverable and inadmissible in evidence. § 14–501(d)(1).

■ Because the instant case seems to us "[a] civil action brought by a party to the proceedings of the medical review committee who claims to be aggrieved by the decision of the medical review committee," § 14–501(e)(1), Suburban's records for Dr. Bender might have been discoverable and immunity ʹmight not attach if the HCQIA did not govern the outcome of this case. *See Brem v. DeCarlo, Lyon, Hearn & Pazourek,* 162 F.R.D. 94, 97 (D.Md.1995) (exception under section 14–501(e)(1) controls only when physician who is the subject of a peer review action has been aggrieved by that action). Dr. Bender, of course, would have been required to establish bad faith on the part of the reviewers. § 14–501(f). Furthermore, we believe that State and federal immunity and State confidentiality provisions, although important to protect the public from incompetent practitioners, cannot be used to shield persons who would perpetuate truly unlawful conduct under the guise of professional discipline. *Cf. Unnamed Physician v. Commission on Med. Discipline,* 285 Md. 1, 13, 400 A.2d 396 (1979) (confidentiality statute intended in part to "prevent outsiders, such as former patients, from getting minutes and notes that relate solely to disciplinary proceedings," for use in malpractice cases), *with Price v. Howard County Gen. Hosp.,* 950 F.Supp. 141, 143 (D.Md.1996) (finding Maryland medical peer review privilege inapplicable in suit

against hospital for antitrust violations because "the Court must balance the need for discovery ... against the policies behind state privilege"). Were this case a statutory action for discrimination, brought under Title VII or other laws encompassed within the civil rights exceptions of section 11111(a), section 14–501(e)(1) might dissolve any confidentiality for Dr. Bender's records, and arguably for the records of similarly situated male physicians. In such case, the reviewers might lose immunity under section 14–501(f) if Dr. Bender could prove that they acted in bad faith.[22] We thus reject the MHA's reading of Maryland's confidentiality and immunity provisions for medical peer review activities.

## II

Appellant's first argument is that the court erred by entering summary judgment, because she originally claimed not only money damages, which are covered by HCQIA immunity, *see* § 11111(a)(1) ("the professional review body ... shall not be liable in damages"), but also injunctive relief. Injunctive and declaratory relief are not covered by the Act.[23] *See Imperial*, 37 F.3d at 1031 ("the actual protection given by the Act is limited to damages liability"); *Mathews*, 883 F.Supp. at

---

**22.** MHA would take issue with us in this regard, citing *Pamintuan*, 192 F.3d at 378. We note that in *Pamintuan*, the Third Circuit held that Dr. Pamintuan, who sued for discrimination under 42 U.S.C. § 1981, which prohibits racial discrimination in the making of public and private contracts, failed to counter the hospital's proffered non-discriminatory reason for suspending her privileges. Because Dr. Pamintuan's discrimination claim so failed at the outset, the hospital prevailed on summary judgment, *and*, having met the four-prong statutory test, it enjoyed immunity under the HCQIA.

**23.** The legislative history explains congressional rationale:

Initially, the Committee considered establishing a very broad protection from suit for professional review actions. In response to concerns that such protection might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls, however, the Committee restricted the broad protection. As redrafted, the bill now provides protection only from damages in private action, and only for proper peer review, as defined in the bill. H.R. Rep. 99–903, at 9.

1035 ("the Act does not provide immunity from suit or from injunctive or declaratory relief"). In response, Suburban argues, citing *Sugarbaker* and *Imperial,* that Dr. Bender abandoned her claim for injunctive relief because she failed to pursue that remedy with sufficient vigor. In cases similar to the one *sub judice,* the Fourth and Eighth Circuits have applied an "active pursuit" test requiring physicians (i) to move for injunctive relief and (ii) to press the issue after the defendants successfully assert HCQIA as to damages, in order to maintain a claim for injunctive relief. *Sugarbaker,* 190 F.3d at 918; *Imperial,* 37 F.3d at 1031. Dr. Bender, they argue, quoting *Imperial,* 37 F.3d at 1031, "merely 'prayed' for an injunction" and did not "move[ ] for injunctive relief or press[ ] the issue of injunctive relief when 'the vitality of the Complaint, in its entirety, was put to the test on an immunity defense.' "

Although Suburban conveniently omits Dr. Bender's compliance with the second prong of the active pursuit test,[24] they note correctly that she failed the first prong.[25] The docket shows no motion for injunctive relief nor any effort to press that remedy on the court, other than Dr. Bender's reference to her prayer for relief in her Motion in Opposition of Summary Judgment. This reference, buried in a footnote on page

---

**24.** In her Memorandum in Opposition to Motion for Summary Judgment, Dr. Bender states the following:

In any event, even if defendants prevail under HCQIA, the Court should still permit this case to go forward based on Dr. Bender's claim for injunctive relief. HCQIA does not bar claims for injunctive relief ..., and "[i]n Maryland a court of equity may properly grant injunctive relief to protect a physician in his right to treat his own patients in a hospital where its constitution and by-laws accord him that right...."

Appellant's Mem. Opp. Summ. J. at 51 n. 38 (quoting *Ishak v. Fallston Gen. Hosp. & Nursing Ctr.,* 50 Md.App. 473, 479, 438 A.2d 1369 (1982)) (citations omitted).

**25.** Even if Dr. Bender had continued to pursue her claim, section 14–501(f) of the Health Occupations Article might have barred it if Dr. Bender had been unable to establish that Suburban's peer reviewers had acted in bad faith.

51, treats Dr. Bender's prayer almost as an afterthought. We find that such treatment hardly qualifies as active pursuit.

Dr. Bender also relies on *Ishak v. Fallston Gen. Hosp. & Nursing Ctr.*, 50 Md.App. 473, 438 A.2d 1369 (1982), a case we find inapposite. In *Ishak*, we held that a physician whose hospital privileges were canceled in violation of that hospital's own bylaws was entitled to procedural due process under those bylaws before being discharged. We held that the court had the authority in equity to enjoin the hospital to follow its bylaws. We gave the court the authority to use injunctive relief to right the wrongs inflicted by lack of process. Here, Suburban made a long and intensive effort, within the parameters of its own bylaws, to determine whether Dr. Bender's privileges should have been canceled. Lack of process is most assuredly not the issue. Indeed, as the next section shows, Dr. Bender's efforts to assail Suburban's process fail, and thus no basis exists to justify remanding this action to the trial court for injunctive action.

### III

Dr. Bender's claim reaches us on review of the trial court's grant of Suburban's motion for summary judgment on grounds that the hospital enjoyed HCQIA immunity. In *Goodwich*, 343 Md. at 185, 680 A.2d 1067, the Court of Appeals had opportunity to examine the interplay between the HCQIA and Maryland's standard for summary judgment in a case at the same procedural posture as the case *sub judice*. *Goodwich* shows that Dr. Bender's task as non-movant was a daunting one.

On summary judgment, we examine whether the trial court's decision was legally correct. *Id.* at 204, 680 A.2d 1067 (citing *Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 144, 642 A.2d 219 (1994)). Federal law governs our application of the HCQIA, but we follow our own standards for summary judgment, derived from Maryland Rule 2–501. *Id.* at 205, 680 A.2d 1067 (citing *Rein v. Koons Ford*, 318 Md. 130, 147, 567 A.2d 101 (1989)). That rule states in relevant part, "[t]he

court shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e). The underlying purpose of summary judgment is "to determine whether a factual controversy exists requiring a trial." *Goodwich,* 343 Md. at 206, 680 A.2d 1067 (citing *Hartford,* 335 Md. at 144, 642 A.2d 219). In making this determination, the trial judge does not weigh evidence as would a jury during a trial. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). Instead, the court determines whether the non-movant's evidence, or inferences deducible therefrom, is sufficient to permit the trier of fact to reach more than one conclusion. *Id.* at 207, 680 A.2d 1067. In civil cases like this one, "the generation of a genuine dispute of material fact is ... the equivalent of meeting a preponderance of the evidence standard at trial." *Id.* The proper summary judgment standard here is thus whether Dr. Bender produced sufficient evidence of the existence of a genuine factual dispute over Suburban's entitlement to qualified immunity under the HCQIA. *See Bryan,* 33 F.3d at 1333 (" 'Might a reasonable jury, viewing the facts in the best light for [the plaintiff], conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)?' If not, the court should grant the defendant's motion.") (quoting *Austin,* 979 F.2d at 734) (citations omitted).

▮▮▮ The HCQIA's standards further raise the bar. The burden of proof that Suburban failed to act in a way that assures its immunity falls to Dr. Bender. The statute presumes that the peer review process was fair. *See* § 11112(a) ("A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence."); *Sugarbaker,* 190 F.3d at 912. Moreover, to be fair, as we explain *supra,* Suburban's review action only needed to be objectively reasonable—*i.e.,* the reviewers reasonably concluded, in light of all

the circumstances and based on all information available to them, that their actions would restrict incompetent behavior or otherwise protect patients. *See, e.g., Brader,* 167 F.3d at 840; *Mathews,* 87 F.3d at 635; *Imperial,* 37 F.3d at 1029.

Dr. Bender asserts that Suburban failed to reach the statutory standard for immunity on three of the four conditions required by section 11112(a). Failure to meet any one of these four conditions precludes HCQIA immunity. *See Brown v. Presbyterian Healthcare Serv.,* 101 F.3d 1324, 1333 (10 th Cir.1996). We address each of her arguments in turn.

## A

Dr. Bender first asserts that Suburban failed to make "a reasonable effort to obtain the facts of the matter." § 11112(a)(2). In doing so, she describes the proceedings as a "Kafkaesque process ... designed to be ... unreasonable ... and to pervert, rather than obtain, the facts" and directs this Court's attention to several characteristics of the peer review process, including:

i. "wide open" physician QA files that "anyone [could] use to cause trouble," including "to divert attention from the writers' own shortcomings or to retaliate" for a physician's complaints about another provider's substandard care;

ii. failure of the Credentials Committee to investigate whether incident reports, including the altercation with Dr. Johnson, were correct and reasonably valid, before it includes them as part of a pattern of behavioral incidents;

iii. participation in the MEC review of the credentials report by a committee member who might have held personal animus against Dr. Bender;

iv. the Credentials Committee's consultation with an outside psychiatrist, Dr. Flynn, to determine whether Dr. Bender suffered from impairment or could otherwise benefit from behavioral therapy;

v. the Credentials Committee's consideration of Dr. Flynn's conclusions;

vi. consideration by the hearing panel of weak incident reports, *i.e.,* Dr. Pollen's assertion that the "documents look pretty anemic," but that there "must be more behind this than meets the eye";

vii. inclusion of a physician on the hearing panel who was alleged to be biased against Dr. Bender; and

viii. the MEC's reliance on Dr. Flynn's report and its reliance on "the sheer number" of incidents in Dr. Bender's file.

To be sure, the behavior of some of Suburban's peer reviewers leaves something to be desired. Dr. Bender adduced some evidence that certain key persons in the process harbored enmity against her, and Suburban's open system of QA reporting is rife for abuse. Under the HCQIA, however, the hospital's efforts to obtain the facts need not have been perfect, only objectively reasonable. *See Imperial,* 37 F.3d at 1030; *Perez,* 1998 WL 464916, at *10. When we consider the process in its totality, we thus see a multi-layered investigation lasting over, three years, designed to review the facts available in Dr. Bender's QA file; determine whether Dr. Bender suffered impairment; and allow Dr. Bender to examine records, present her own witnesses, and question those persons who spoke against her.

Starting at the top with the Board of Trustees, we note that this body considered, among other things, the hearing panel's report and recommendations; the MEC's reports and recommendations, including Dr. Flynn's report; Dr. Bender's signed settlement agreement and her letter withdrawing from that agreement; the findings of probable cause by the Maryland Human Relations Commission; and the dismissal of charges by the EEOC. Dr. Bender and her attorney also addressed the Board.

The MEC, before its May 2, 1995, vote reinstating the requirement for behavioral counseling, considered the following documents: the hearing panel's report and recommendations; Dr. Bender's signed settlement agreement; correspondence between attorneys for Dr. Bender and for the hospital

regarding the settlement agreement; a letter from the hospital president dated April 27, 1995, advising Dr. Bender that the Board had voted to reappoint her without behavioral counseling if she dropped her discrimination actions; and a letter from Dr. Bender to the MEC dated May 1, 1995, explaining why she would not drop the discrimination claims.

The Credentials Committee, which made its recommendation to the MEC after its April 15, 1993, special meeting, considered Dr. Bender's QA file; her credentialing file; Dr. Flynn's report; a report made by Dr. Bender's personal psychiatrist, Dr. Glatt; and Dr. Bender's own statements to the committee. Finally, over an eight-day period, the hearing panel heard the testimony of nearly thirty witnesses, including evidence of purported gender-based disparate treatment, *see supra* note 11, and examined hundreds of pages of exhibits. Dr. Bender's counsel was present throughout the entire process.

When examined in its totality, the entire multi-step fact-finding process meets or even exceeds the HCQIA standard of objective reasonableness. The process, perhaps not as perfect or as inclusive as Dr. Bender would have liked, provided the reviewers with enough data, including information about her shortcomings, to reach an objectively reasonable decision. *See Goodwich,* 343 Md. at 210, 680 A.2d 1067; *see also Brader,* 167 F.3d at 841–42 (even if peer review report failed to examine every case and contained errors, the process was reasonable where the ultimate decisions considered evidence besides the report, including that which showed the surgeon to be a disruptive force at the hospital who repeatedly exercised poor judgment in his surgical, teaching and personal interactions). The process also tracked with the Medical Staff Bylaws and was probably not significantly different from processes used by other hospitals.

Because the fact-gathering was reasonable, Dr. Bender's present arguments regarding the reviewing bodies' weighing of the evidence, specifically her concerns about the validity of certain QA reports and Dr. Flynn's report, must fail. It is

not the function of this Court under the HCQIA to reweigh the evidence or substitute our judgment for that of Suburban's peer review bodies. *See, e.g., Bryan,* 33 F.3d at 1337 (citing *Shahawy v. Harrison,* 875 F.2d 1529, 1533 (11th Cir.1989)); *Manzetti v. Mercy Hosp.,* 741 A.2d 827, 833–34 (Pa. Commw.Ct.1999). Furthermore, given the centrality of QA files in medical staff matters, we note that Suburban would have been remiss under the standard of objective reasonableness had it failed to consider them, although we are troubled that reports reflecting personal animus might go unverified or have such an extended shelf life. We likewise observe that it would have been unthinkable to allow the MEC to advance its assessment that Dr. Bender "possibly was an impaired physician" without seeking an evaluation from an outside expert. The reports Dr. Bender challenges, moreover, were not the only bases for the professional review action, as she implies in her brief. The hearing panel heard from almost 30 live witnesses, including Dr. Bender, about that physician's comportment. Counsel for both Dr. Bender and the hospital submitted legal briefs to the panel at the conclusion of the evidence. As *Brader,* 167 F.3d at 841, explains:

> The relevant inquiry under § 11112(a)(2) is "whether the totality of the process leading up to the Board's professional review action . . . evidenced a reasonable effort to obtain the facts of the matter." Even assuming a flaw in . . . [one] report, we reiterate that . . . [the] reports were not the only sources on information used in reaching decisions about Brader's professional status. . . . The hearing panels themselves heard testimony from a number of witnesses, including individuals the panels called independently. The appellate review panel and the Board of Directors had before them exhibits, briefs, and reports, including those submitted by Brader.

Dr. Bender also complains on appeal that evidence of sex discrimination failed to reach the appellate reviewers, *i.e.,* the Board of Trustees and the MEC, because only the report of the hearing panel, and not its entire transcript, was reviewed at the appellate level. This argument also fails under the

standard of objective reasonableness. There is nothing irregular about a high-level reviewing body leaving the detailed fact-finding efforts to a lower-level hearing panel or committee. As the record establishes, the work of the primary fact-gathering body, the hearing panel, was extraordinarily detailed.

 Nor can Dr. Bender legitimately complain that Suburban's peer reviewers acted in a biased fashion to "falsif[y] the record in a way that poisoned the process." Although she adduced some evidence that Doctors Pollen of the hearing panel and Rothstein of the MEC may have disliked her personally—which is, we note, legally irrelevant, see *Sugarbaker*, 190 F.3d at 914—the record shows no objection on her part regarding their participation in the process and she thus waived the right to object on appeal. *See* § 11112(b) ("A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) of this section with respect to a physician if the following conditions are met (*or are waived voluntarily by the physician* ) . . . .") (emphasis added); *Bryan*, 33 F.3d at 1336 ("Bryan made no contemporaneous objections to the manner in which the hearing procedures were conducted; section 11112(b) explicitly provides that compliance with its terms is not required if the physician voluntarily waives them."). The record shows, furthermore, that the hearing panel, from which the bulk of its data comes, heard and considered a broad swath of evidence, including the testimony of several witnesses that were strongly supportive of Dr. Bender. Dr. Bender's own psychiatric expert testified regarding the report by Dr. Flynn of which she is so critical.

As for the inaccurate official report on her altercation with Dr. Johnson, it appears that the account was eventually corrected before the panel. One member of the hearing panel testified that the group gave little weight to the Johnson case, because its members recognized that Dr. Johnson was at fault. Ultimately, even Dr. Flynn came to acknowledge that Dr. Bender's reaction to Dr. Johnson's outburst had been proper.

Signs that bias and animus toward Dr. Bender affected Suburban's decision to cancel her privileges are indeed troubling if they have substance; however, under the standard of objective reasonableness, they are not fatal to Suburban's summary judgment motion. *See Pamintuan*, 192 F.3d at 378; *Sugarbaker*, 190 F.3d 905. We thus affirm the trial court's finding that Dr. Bender failed to establish a genuine issue of material fact as to whether Suburban failed to meet the second prong of the test to qualify for HCQIA immunity.

**B**

Dr. Bender next argues that Suburban failed to act in the reasonable belief that its action was in furtherance of quality health care. *See* § 11112(a)(1). First, she argues that the Trustees failed to examine Dr. Bender's whole QA file, which in her opinion would have shown no incidents of abusiveness or disruptiveness after 1988. Instead, she claims, they relied only on the conclusions of subordinate committees. She also labels as untenable the Board's reasoning that, unless she underwent behavioral counseling, its members could not be assured that her future conduct would be unexceptional. Second, Dr. Bender cites the Board's reversal on the subject of behavioral counseling between its April 26, 1995, meeting and its final action on February 21, 1996. After the April 1995 meeting, the Board required only that Dr. Bender drop her discrimination claims against the hospital, and not that she enter into counseling. The counseling requirement, which had been recommended by the MEC earlier, was reinstated at the time of the final vote. Dr. Bender argues that this "new" requirement shows that the Board was truly motivated by its fear of litigation rather than its concerns about quality health care. Third, she contends that "Suburban's medical establishment did not believe that the pervasive 'behavioral' characteristics of physicians who happened to be male . . . are inimical to quality health care," and thus the Trustees could not have reasonably believed that they were furthering quality health care by canceling only those privileges belonging to Dr. Bender and not the privileges of similarly situated male physicians.

That Dr. Bender takes to task the Trustees for failing to examine her QA file, after she criticizes the MEC and Credentials Committee for relying too heavily upon the same file, deflates her first contention in our view. She cannot have it both ways. The record, moreover, shows no objections on her part when those files were not used during the Trustees' proceedings. By failing to make a contemporaneous objection, she waived her right to object on appeal. *See* § 11112(b); *Bryan,* 33 F.3d at 1336.

As for the Board's concern about whether Dr. Bender's good behavior during the review process would continue, the record shows that its request for assurances was well within its discretion. A provider's mental health problems can and do affect the quality of patient care, and peer review boards have historically had discretion to require physicians with behavioral problems or psychiatric illnesses such as drug addiction or alcoholism to seek treatment as a condition of future employment. Although we may not substitute our judgment for that of the Board, *see Bryan,* 33 F.3d at 1337 (HCQIA grants broad discretion to hospital boards and reinforces the courts' tradition reluctance to substitute their judgment for that of the medical professionals), Suburban adduced sufficient evidence in our view to ascertain that Dr. Bender's behavior made it difficult for her to work with the nursing staff, which in turn affected the quality of health care at the hospital. A nursing manager, for example, testified at the hospital hearing that Dr. Bender frightened some nurses so badly that they hid when she came into the area:

[I]t was very commonly known, that you really are walking on egg shells around her, and weren't quite sure when she would be angry or when she would be cooperative with that type of thing. It made it very difficult for nurses to care for their patients basically, because you have to work together, you know, nurses and physicians, in a very collaborative effort, and it is hard when people are afraid to call her, you know, when she is on call or off hours, or whatever, because you are not quite sure what type of response you are going to get. . . .

I think that anytime you have someone that you can't communicate with, because nursing and medicine have to be collaborative, you have difficulty in that area, it definitely impacts patient care, because you might not want to call this person, you might want to avoid doing that, like you might want the other shift to do that.

An administrator testified:

Again, this behavior, as I said, was for Dr. Bender, it appears normal that Dr. Bender, that was the way she responded to the nurses, if things did not go the way she thought they should go.

The way she would deal with it was, she would start yelling, and in the nurses station and yelling at the nurses, that is when she came on a unit, she wanted to know, you know, who was taking care of her patients, and she wanted that nurse to come and talk to her right away. So that was, you know, a standard for Dr. Bender. . . .

When Dr. Bender would bring a patient into the hospital, and the patient would work on that floor, the nurses did not like to take care of Dr. Bender's patients, because in the past, when they would take care of it, they would become burned out. It was demoralizing to them to have her yell at them, to question what they did.

Dr. Bender's second argument, that the Board and MEC simply retaliated against her for backing out of the April 4, 1995, Memorandum of Agreement and continuing to press her gender discrimination claims, is also specious. Evidence of possible retaliation or other ill motives is immaterial under the standard of objective reasonableness. *See, e.g., Burney v. East. Ala. Med. Ctr.,* 939 F.Supp. 1514, 1517–23 (M.D.Ala. 1996). The record, moreover, shows that the hospital reviewers took action based on sufficient evidence and in the reasonable belief that they were acting in furtherance of quality health care. Members of the MEC reinstated the behavioral counseling requirement because they believed that Dr. Bender's refusal to budge from her hard-line position after the Board had extended the olive branch showed that she was

unwilling to change her behavior for the better. The Board reiterated this rationale in its minutes for February 21, 1996. Its interpretation of Dr. Bender's actions, we note, falls in line with Dr. Flynn's opinion that she failed to learn from her confrontations and modify her behavior so that she could work cooperatively with her fellow health professionals.

Dr. Bender's third argument, that her reviewers acted in bad faith with discriminatory animus and that she was treated differently than similarly situated male physicians, has been treated extensively in Section I *supra.* We here reiterate our conclusion that the HCQIA's standard of objective reasonableness precludes us from giving her allegations any special significance. For all three of her arguments on this point, then, Dr. Bender failed to establish a genuine issue of material fact as to whether Suburban failed to meet the first prong of the test to qualify for HCQIA immunity, and we thus affirm.

## C

Dr. Bender also alleges generally that Suburban failed to take action in the reasonable belief that such action was warranted by the facts known after a reasonable effort to obtain them. *See* § 11112(a)(4). She adduced no specific proof to support her argument other than a general reference to her prior arguments. We thus affirm the trial court's finding that Dr. Bender failed to establish a genuine issue of material fact as to whether Suburban failed to meet the fourth prong of the test to qualify for HCQIA immunity.

## IV

Finally, Dr. Bender argues that the trial court erred in finding that Suburban's Medical Staff Bylaws did not create an enforceable contractual obligation when it granted partial summary judgment to the hospital. Article II, Section C of the bylaws, as ratified by the hospital's Board of Trustees, states:

Medical Staff membership, status, and clinical privileges shall be granted or denied without regard to sex, race,

creed, color, handicap, or national origin or on the basis of any other criteria unrelated to the delivery of quality patient care in the Hospital consistent with the Hospital's purposes, needs, and capabilities.

The preceding language, Dr. Bender claims, constitutes a contract between Suburban and its physicians that those physicians cannot be removed from the staff because of sex discrimination.

Here again, Dr. Bender tries to do via the common law of contracts what she failed to do in her employment discrimination cases. She reasons that because

HCQIA itself expressly provides that it does not afford immunity for violations of the civil rights laws ..., [t]he issue of discrimination in this case is analogous to discriminatory discharge of an employee. In application, the bylaw is physician-specific and promises a definite and specific benefit of protection against discriminatory discharge.

This promise of a "definite and specific benefit" to the individual physician, she argues, separates the facts *sub judice* from other cases in Maryland's body of law on employee handbooks and policy manuals where our courts have found such promises to be non-specific statements of policy or corporate aspirations.[26] Furthermore, physicians such as Dr. Bender are

---

**26.** *See, e.g., University of Baltimore v. Iz,* 123 Md.App. 135, 716 A.2d 1107 (even though "collegiality" not listed among contract or written policy considerations for the granting of tenure, the tenure process is inherently subjective and discretionary, and collegiality is a valid consideration, impliedly embodied within the listed criteria), *cert. denied,* 351 Md. 663, 719 A.2d 1262 (1998); *MacGill v. Blue Cross of Md.,* 77 Md.App. 613, 551 A.2d 501 (written personnel policies requiring impartiality, posting of vacancies, nondiscrimination and affirmative action are aspirational statements of policy and not contractual, because they do not promise any specific employee a specific and definite benefit), *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989); *see also Ayers v. ARA Health Serv., Inc.,* 918 F.Supp. 143 (D.Md.1995) (handbook statement that it was employer's policy to behave ethically was insufficient to form basis for breach of contract claim); *Ferragamo v. Signet Bank/Md.,* Civ. A. No. WN–88–3333, 1992 WL 219826, at *4 (D.Md. Mar. 17, 1992) (handbook provisions promising equal employment opportunity do not form basis for implied contract); *Conkwright v. Westinghouse Elec. Corp.,* 739 F.Supp. 1006 (D.Md.1990) (handbook pledge of employment

independent contractors to the hospitals where they have privileges, *see, e.g., Bender,* 159 F.3d at 188 ("a doctor with staff privileges at a hospital is an independent contractor"); *Cilecek v. Inova Health Sys. Serv.,* 115 F.3d 256, 261–62 (4th Cir.1997) (physician under contract to provide emergency medical services at hospitals was independent contractor and not employee), she contends, and thus, the court incorrectly premised its findings upon Maryland's common law of contracts modifying at-will employment.

We agree with the trial court, however, that the language of Suburban's Medical Staff Bylaws is "aspirational and not contractual and can't be the subject of a breach of contract suit." Although Dr. Bender was not Suburban's at-will employee, we find no authority mandating that we apply any body of law other than that pertaining to representations made in employee handbooks and similar guidebooks. Reasoning by analogy, we thus apply that body of law to the instant facts.

In Maryland, an employment relationship of indefinite term is, with few exceptions, presumed to be at-will, terminable by either party at any time. *Adler v. American Standard Corp.,* 291 Md. 31, 35, 432 A.2d 464 (1981). We recognize a limited exception to at-will employment for employer policy statements, such as those found in handbooks and on applications, "when, with knowledge of their existence, employees start or continue to work for the employer." *Dahl v. Brunswick Corp.,* 277 Md. 471, 476, 356 A.2d 221 (1976) (holding that severance pay policy was part of employment contract). Nevertheless, we have refused to find employment contracts where an express disclaimer was included, *see Fournier v. United States Fidelity & Guar. Co.,* 82 Md.App. 31, 42–42, 569 A.2d 1299, *cert. denied,* 319 Md. 581, 573 A.2d 1337 (1990), or where the employer's publication made only general statements of policy that could not be applied to specific employees.

stability and fair treatment not binding on employer, because disclaimer statement was added to handbook during employee's tenure with the company), *aff'd,* 933 F.2d 231 (4th Cir.1991).

*See, e.g., MacGill v. Blue Cross of Md.,* 77 Md.App. 613, 618–19, 551 A.2d 501, *cert. denied,* 315 Md. 692, 556 A.2d 673 (1989). Under *Staggs v. Blue Cross of Md.,* 61 Md.App. 381, 392, 486 A.2d 798 (1985), promises with potentially enforceable specificity include statements "affording post-termination benefits, such as severance pay, and those affording pre-termination benefits, such as requiring that termination be for cause or setting forth a prerequisite mechanism for rehabilitating a deficient employee." On the other hand, an employer's promises of "the opportunity to apply for vacant positions . . . and its commitment to fill those vacancies with the most qualified applicant, consistent with the law, fairness, and its expressed intention to take affirmative action" are not contractual undertakings under our law. *MacGill,* 77 Md.App. at 619, 551 A.2d 501. The anti-discrimination language in the Medical Staff Bylaws clearly falls into the latter category of promises, and we hold that it bound Suburban only in the moral sense.[27]

\* \* \*

In summary, Dr. Bender's appeal fails not for want of a wrong but for want of a cause of action that would take this matter outside of the scope of the HCQIA where the instant facts might withstand a motion for summary judgment. Dr. Bender has paid a price exceeding that which one might expect to pay for uttering (or even screaming) misdirected obscenities. It appears that some peevish individuals may have set their sights on running Dr. Bender out of the hospital. As reprehensible as some of their actions might have been, they succeed as a matter of law. Of course, Dr. Bender's own strategic miscalculation also played a part in her loss of hospital privileges. We note that, had she dropped her discrimination suits while the hospital's offer was on the table, she might have maintained her privileges.

---

27. Even if the bylaw language were otherwise binding, we note that HCQIA would provide immunity for Suburban on the contract law claim. *See, e.g., Bryan,* 33 F.3d at 1331 (hospital entitled to HCQIA immunity on disciplined physician's breach of contract claim).

Nevertheless, as both federal and State courts decided in the early employment discrimination cases, the facts *sub judice* fall outside of that body of law. Dr. Bender's common law causes of action are a litigator's "Plan B"; to her misfortune, they bring the HCQIA into play. Although that statute voices a clear exception for Title VII cases, we will not stretch that exception to cover common law claims, even if some of the evidence arguably shows subtle gender discrimination. The coverage of federal statutes is not ours to expand and, thus, the trial court was bound by the HCQIA's general standards for overcoming immunity. When we examine the trial court's analysis of the evidence in light of these standards and the interpreting cases, we conclude that the court did not err when it granted summary judgment in favor of Suburban.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**